**James R. PARTINGTON, Plaintiff–Appellee,**

v.

**BROYHILL FURNITURE INDUSTRIES, INCORPORATED, Defendant–Appellant.**

No. 92–3825.

United States Court of Appeals, Seventh Circuit.

Argued May 3, 1993.

Decided July 19, 1993.

---

270

Raymond J. Hafsten, Jr. (argued), Indianapolis, IN, for plaintiff-appellee.

James R. Fisher, Todd W. Ponder (argued), Ice, Miller, Donadio & Ryan, Indianapolis, IN, for defendant-appellant.

Before POSNER and COFFEY, Circuit Judges, and WILLIAMS, Senior District Judge.*

POSNER, Circuit Judge.

James Partington, a salesman employed by the Broyhill furniture company, was discharged the day before his sixtieth birthday, and brought suit under the age discrimination in employment law. A jury found in his favor and judgment was entered for more than $200,000 in back pay, front pay, prejudgment interest, and attorneys' fees.

The company's main contention on appeal is that it was entitled to judgment notwithstanding the verdict because there was no evidence that it dismissed Partington because of his age. There was little evidence; that is true. In 1980 Broyhill had begun reducing the size of its work force and in 1987 it decided that three salesmen were one too many in the area (comprising most of Indiana) to which Partington was assigned. The other two salesmen assigned to that area were Shepard and Neal. Shepard, it is conceded, was the best of the three. The question was whether Neal, who was in his thirties, or Partington would be let go. The axe fell on Partington. He has since found other employment as a furniture salesman, but at a reduced income.

█ Neal had been hired in 1984 and had exceeded his annual sales quota (set by the company at the beginning of each year) in each of the four years that ended with Partington's dismissal. Partington had failed to meet his quota in 1984 and 1985 but had exceeded it in each of the following two years and in 1986 had done so by a greater percentage than Neal. If this were all the evidence in the case, it would indeed be a no-evidence case, and Partington's evidence that he was praised for his performance in both 1986 and 1987 would be irrelevant. Broyhill does not claim that Partington was dismissed because of poor performance, but rather as the result of a Darwinian struggle among three salesmen for two positions. The weakest lost. The market, like the jungle to which it is sometimes compared, is pitiless. Nothing in the age discrimination law provides tenure to competent older workers. They can be let go for any reason or no reason, provided only that the reason is not their age. They can be let go because they are not quite as good as someone else who can do their job, even if that someone else is a young man.

█ But more evidence was presented to the jury than we have discussed so far. The least of the additional evidence, though heavily stressed by Partington, is that pretrial discovery turned up a list of salesmen with their ages written next to their names and that when Partington was dismissed he was offered severance pay if he would sign a release of his right to sue under the age discrimination law. Standing by itself all this evidence showed was that Broyhill was aware that a company that dismisses an older worker has potential liability under the age discrimination law. No inference of guilt can be drawn from awareness of one's legal obligations; to do so would be to promote the ostrich over the farther-seeing species. But the innocuous evidence of age awareness be-

---

* Hon. Spencer M. Williams of the Northern District of California, sitting by designation.

comes significant in conjunction with evidence that Broyhill ordered a "purge" of the files of its terminated salesmen (most of whom were over the age of 40 and thus potential age discrimination plaintiffs). The word was first used by Partington's counsel but it was adopted by the employee who had administered the purge. Broyhill presented evidence that the purpose was merely to eliminate duplicates, yet the purge came to light only because pretrial discovery turned up from other sources documents that should have been in the terminated employees' files but were not. We know that Broyhill was sensitive to the possibility of being sued by these employees under the age discrimination law, and for this sensitivity, as we have said, it cannot be criticized. But if, being sensitive to the possibility of a suit, a company then destroys the very files that would be expected to contain the evidence most relevant to such a suit, the inference arises that it has purged incriminating evidence.

There is more. When Partington asked the reason for his dismissal he was told that performance had nothing to do with it. Broyhill explains that all this meant was that he wasn't being terminated because of poor performance, only because of poorer performance than his rivals in the sales force. This may be; but the executive who told Partington that he was not being dismissed because of performance never testified to what he meant, and the jury was entitled to infer from his silence on the question that it was a meaning unfavorable to Broyhill. Moreover, despite the comparison in sales performance which seemed to favor Neal over Partington, the executives of Broyhill who were responsible for dismissing Partington testified that they couldn't recall the precise reason why Neal was preferred, and some of them referred vaguely to future as well as past performance. Moreover, while Neal had a better record than Partington, it was also a shorter record (Partington had been with the company since 1973), and might prove to be a flash in the pan. So the sales figures were not necessarily as significant as they may have seemed, and anyway as we have pointed out there is no evidence that they were the actual basis for the decision in favor of Neal. Broyhill notes that despite its alleged bias in favor of the young the average age of its sales force was higher at the end of the 1980s than at the beginning. But this means very little, since with little new hiring the average age of the work force was bound to grow significantly over a ten-year period.

Broyhill presented only one live witness. Most of its evidence was presented in the form of depositions. Live witnesses make a more forceful impression, cf. *Traylor v. Husqvarna Motor,* 988 F.2d 729, 734 (7th Cir.1993), and at argument Broyhill's lawyer conceded that it may have been a tactical mistake not to present more of them, as it could easily have done since they are Broyhill's own executives. We are not at all sure that the concession is warranted. The decision not to put the executives on the stand may have been a tactical one, motivated by concern that they would be demolished on cross-examination or that their lack of recall would make an even worse impression on the jury when they were testifying in person. The failure to call any of these witnesses is particularly significant in light of the deposition testimony of one of them, who when asked by Partington's counsel, "You did not advocate [Partington's retention]?" answered, "The longevity may have had some bearing in there." By longevity he evidently meant length of service rather than chronological age, but if Partington's length of service counted against him this would undermine the company's argument that he was let go only because his sales performance was worse than Neal's. Later in the deposition Broyhill's lawyer asked the witness whether what he had meant was that he "did not consider [Partington's] length of time [with the company] alone sufficient to champion him," and he said that this was correct. The jury was not required to accept this somewhat improbable correction, especially when deprived of an opportunity to see the contradiction between the two statements explored in the give and take of the actual trial.

Partington's case was certainly weak, and another thing that makes it so was his lack of any explanation for why Broyhill might have wanted to fire him because of his age. There was no evidence that Partington was a more expensive employee than Neal by reason of

his greater age or that Broyhill's management holds stereotypical views about the performance of older workers. Nevertheless we cannot say that the evidence of age discrimination was so weak that no rational jury could have found that age is more likely than not to have caused Broyhill to retain Neal in preference to Partington, given the normal preference for retaining a more over a less experienced employee, other things (such as salary and benefits) being equal.

■ We move to the remedial questions. Broyhill complains that the award of both back pay and front pay (the latter in lieu of reinstatement, not sought by Partington or offered by Broyhill, making front pay a proper remedy, *Fortino v. Quasar Co.*, 950 F.2d 389, 398 (7th Cir.1991); see also *McKnight v. General Motors Corp.*, 908 F.2d 104, 116–17 (7th Cir.1990)) was too speculative because it included allowances for profit-sharing and bonus that might not have been paid, especially since Broyhill declared bankruptcy under Chapter 11 of the Bankruptcy Code shortly after Partington was dismissed. Partington made no effort to prove what he would actually have received in profit-sharing and bonus during the years at issue. All he did was assume that he would have continued to receive these things at the same level as in his last years with the company. This was a mechanical method of estimation, though the Chapter 11 episode is a red herring because it was precipitated by a failed leveraged buyout of Broyhill's parent corporation and did not affect the furniture business; Chapter 11 contemplates the continued operation of the bankrupt rather than its liquidation, and Broyhill's furniture business was not in fact liquidated. Mechanical as Partington's method of estimation was, it was sufficient to satisfy his burden of production, especially when the small amount of money involved (some $18,000) is considered. In general, the larger the stakes in a case, the more money parties will—and should—spend litigating it, because the cost of error is greater the more that is at stake. The amount of proof required to establish damages will tend, therefore, to be proportional to the amount of damages claimed. Cf. *Henry v. Webermeier*, 738 F.2d 188, 193 (7th Cir.1984); *Lenard v. Argento*, 808 F.2d 1242, 1247 (7th Cir.1987).

We of course do not suggest that the amount of proof should be *exactly* proportional to the amount of damages sought, since a lot depends on the number and complexity of the damages issues, which need not be directly related to the size of the damages sought. But it is inevitable and proper that on average the threshold for proving damages will be lower in the small case than in the large. Otherwise the damages recovered in the small case would often be eaten up by the costs of proof, making the net recovery negligible. The same principle applies to back pay. To make a plaintiff prove the amount of back pay to which he is entitled with the same meticulous care to exclude alternative hypotheses as if he were seeking a judgment of $100 million would be ludicrous. So Partington satisfied his burden of producing evidence of lost back pay, and in response Broyhill put in no evidence at all, even though it has better access to the details of its own profit-sharing and bonus arrangements than Partington.

■ The issue with regard to front pay is identical, and requires no separate discussion except to observe that the superiority of Broyhill's access to facts concerning its policies on bonus and profit sharing is particularly clear for the years after Partington left the company's employ. With regard to attorney's fees, Broyhill argues perfunctorily that since Partington did not succeed in establishing a willful violation, which would have entitled him to double damages, his victory was only partial and he should not have been awarded as he was more than $80,000, a figure equal to 40 percent of Partington's total recovery, including back pay, front pay, prejudgment interest, and the attorney's fees. The issue, however, is not whether Partington could have done even better, but whether his expenditure on attorney's fees was reasonable in relation to the difficulty, stakes, and outcome of the case. *Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983); *Kurowski v. Krajewski*, 848 F.2d 767, 776 (7th Cir.1988); *Lenard v. Argento, supra*, 808 F.2d at 1247. A lawyer who figures out the likeliest outcome in his favor, and aims only for that, is likely to fall short. The good

lawyer aims higher, and is not improvident to do so. Broyhill does not so much as argue that Partington could have spent less without jeopardizing his prospects for winning what he did win, or that some of the attorney's fees that he incurred were incurred in a quixotic effort to establish willfulness.

■ Broyhill argues that the judge should not have awarded prejudgment interest, because it was a close case. We disagree. Money has a time value, and prejudgment interest is therefore necessary in the ordinary case to compensate a plaintiff fully for a loss suffered at time t and not compensated until t + 1, 2, 3 ... n. It is presumptively available in suits under federal law, *In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1331 (7th Cir.1992) (per curiam); *Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989), including suits under the age discrimination law unless liquidated or punitive damages are also awarded, *Fortino v. Quasar Co., supra*, 950 F.2d at 397–98, as they were not here, however. Broyhill argues that the plaintiff ought to be required to prove that he either had to borrow money during the prejudgment period, and therefore incurred an out of pocket interest cost, or would have invested the award of back and front pay, and therefore incurred an opportunity cost. Again we disagree. Because of litigation delay, Partington lost the use of money that was rightfully his. If he would have neither paid interest with the money nor invested it, this just shows that he would have derived even greater value (by his lights) from the money by using it for additional current consumption—perhaps by eating better, or driving a fancier car. He was deprived of that value.

■ Broyhill's last argument (at least the last we need discuss) is that prejudgment interest was incorrectly calculated, because while the judge used the Treasury bill rate, as required by 28 U.S.C. § 1961, he used the rate at the time of judgment, rather than the rates actually prevailing during the five-year prejudgment period, which were on average lower. The statute in question is inapplicable, however, because it governs postjudgment, not prejudgment, interest. *Gor-*

*enstein Enterprises, Inc. v. Quality Care–USA, Inc., supra*, 874 F.2d at 436–37. If the statute were applicable, it would not help Broyhill, because it states that the judge is to use the T-bill rate at the last auction immediately prior to the judgment—not a floating rate over the prejudgment period. No statute governs prejudgment interest in federal cases, and in *Gorenstein* we suggested, and in *In re Oil Spill by the Amoco Cadiz, supra*, 954 F.2d at 1332, we held, that district judges should use the prime rate. That rate is normally higher than the T-bill rate, so Broyhill actually benefited from the judge's error in applying an inapplicable statute.

AFFIRMED.