**Garland LOVELY, Plaintiff–Appellee,**

v.

**Fred AUBRY, Individually and as Field Representative of Kentucky State Carpenters AFL–CIO District Council of the United Brothers of Carpenters and Joiners of America, Defendant–Appellant.**

No. 00–5912.

United States Court of Appeals, Sixth Circuit.

Nov. 9, 2001.

Before MERRITT and DAUGHTREY, Circuit Judges, and WELLS,* District Judge.

PER CURIAM.

The plaintiff, Garland Lovely, a union millwright, sued Fred Aubrey,[1] as representative of the local millwright union, for breaching a governing collective bargaining agreement by pressuring Lovely's employer to fire him because Lovely was not a member of Aubry's local union. The jury found for Lovely and awarded him back pay in an sum corresponding to the amount Lovely testified that he had lost as a result of his firing. The district court entered judgment on the jury's verdict. Aubry moved for a new trial, arguing that the jury based the amount of its verdict on speculation. The district court denied the motion, a decision with which we agree and which we therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Garland Lovely has been a union millwright[2] since 1986. At first, his membership was with Millwright Local 1031 in Lexington, Kentucky, but in 1987, in an effort to find work, he transferred his membership to Local 1102 in Detroit, Michigan. In pursuit of employment, Lovely has traveled to Virginia, West Virginia, Ohio, Tennessee, Michigan, Indiana, and Kentucky.

In July 1996, Lovely learned that D & D Machinery Movers and Millwrights, Inc. needed millwrights for a project at the Toyota Motor Plant in Georgetown, Kentucky. Lovely soon began working for D & D on the first shift. At some point thereafter, he was moved to the second shift, where he earned a dollar more per hour as foreman of the second-shift crew. While acting as foreman of the second

---

* The Hon. Lesley Brooks Wells, United States District Judge for the Northern District of Ohio, sitting by designation.

1. Throughout the record, the spelling of the defendant's name varies between "Aubrey" and "Aubry." The correct spelling, and the spelling used in the prior appeal of this case, appears to be Aubrey. However, the parties refer to him as Aubry throughout their briefs in this case, and that is the spelling used in the complaint and, thus, the one we adopt for the purposes of this opinion.

2. A "millwright" installs and performs maintenance on machinery and performs tasks necessary to prepare machinery for use in production. Lovely's experience as a millwright included projects in automobile manufacturing plants, steel mills, and paper mills.

shift, Lovely worked six ten-hour shifts per week, which included 20 hours of overtime compensated at a rate of time-and-a-half. Later, Lovely was moved back to the day shift, where his work week ranged from 40 to 60 hours, depending on the amount of available work.

On April 15, 1997, D & D terminated Lovely. Some two months later, Lovely brought suit in Kentucky state court against Fred Aubry, "individually and as business agent for Millwright's Local Union 1031," alleging that Aubry and other local union agents breached the governing collective bargaining agreement and tortiously interfered with Lovely's employment relationship with D & D by pressuring the company to fire Lovely because of his membership in an out-of-town millwright union. Aubry removed the case to the district court, invoking federal jurisdiction under the Labor Management Relations Act. 29 U.S.C. § 185(a).

After discovery, the district court granted Aubry's motion for summary judgment, and Lovely appealed. In an unpublished opinion, we affirmed the district court's holding that the tortious-interference claim was preempted by the National Labor Relations Act and Labor Management Relations Act but reversed the lower court's ruling that Lovely's breach of contract claim was barred for failure to exhaust grievance remedies. *See Lovely v. Aubrey*, 188 F.3d 508, 1999 WL 701921 (6th Cir.1999).

A two-day jury trial on the contract claim took place following remand. In addition to putting on evidence of Aubry's liability, Lovely testified as to the wages and benefits he lost from the time of his termination until a disabling injury suffered in December 1998 prevented his fur-

ther employment. According to his testimony, at the time of his firing, Lovely was earning a total of $22.85 per hour, inclusive of wages and benefits. Based on a 40-hour work week at $22.85 per hour for 18 months, Lovely testified that his termination cost him $53,720.47.[3]

The jury rendered a verdict for Lovely, finding that his damages were $53,721.00. The jury further found that Aubry was 90 percent responsible for Lovely's damages and that D & D, as an "empty chair" defendant, was responsible for the remaining ten percent. Based on the jury's verdict, the court entered judgment for Lovely and against Aubry in the amount of $48,348.90.

Aubry filed a motion to vacate the judgment and for a new trial on the grounds that, among other things, the damages awarded by the jury were "purely speculative" for two reasons. First, he claimed that Lovely had failed to introduce evidence that 40 hours per week of work would have been available to Lovely during the relevant time period. Second, Aubry argued that the evidence showed that all millwrights, with the exception of two foremen and a supervisor, were laid off from the Toyota project as of May 14, 1997, and that Lovely would not be entitled to recover for damages beyond that date.

The district court "reject[ed] defendant's assertion that the jury awarded speculative damages." The court observed that "[n]ot only did counsel for defendant cross-examine plaintiff on these matters, but he also elicited evidence concerning the nature of the millwright business from nearly every witness who took the stand." Finding that "plaintiff presented sufficient evi-

---

**3.** In order to arrive at this figure, Lovely subtracted his compensation from other jobs worked during the relevant months.

dence to support the jury's damages award," the court denied the motion for new trial. Aubry now appeals from that order.

## DISCUSSION

■ As a threshold matter, Lovely contends that we need not decide whether the district court abused its discretion in denying Aubry's motion for new trial because Aubry failed to move under Federal Rule of Civil Procedure 50 for judgment as a matter of law regarding damages. This argument—which Lovely did not raise with the district court in opposing Aubry's post-trial Rule 59 motion—is without merit. It is axiomatic that "[a] motion under Rule 59 is an appropriate means to challenge the size of the verdict." 11 Charles A. Wright, *et al.*, Federal Practice and Procedure § 2807 at 78 (2d ed.1995).

■ A district court's denial of a motion for new trial will not be set aside "unless the court abuses its discretion." *Meyers v. Wal–Mart Stores, E., Inc.*, 257 F.3d 625, 631 (6th Cir.2001) (affirming district court's denial of defendant's motion for new trial challenging sufficiency of evidence supporting jury's award of damages). "Such an abuse will be found only if we have 'a definite and firm conviction that the trial court committed a clear error of judgment.'"[4] *Id.* (quoting *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir.1989)). *See also* 11 Wright, *et al.*, *supra* § 2820 at 212–14 (noting that "[a]lthough many cases state the test merely in terms of 'abuse of discretion,' most cases add limiting adjectives to indicate the strong showing that must be made before the appellate court will reverse").

■ A party challenging the sufficiency of evidence to support a jury award of damages faces a difficult task. "If there is *any* credible evidence to support a verdict it should not be set aside." *Farber v. Massillon Bd. of Ed.*, 917 F.2d 1391, 1395 (6th Cir.1990) (emphasis added) (citing *Werthan Bag Co. v. Agnew*, 202 F.2d 119 (6th Cir.1953)). *See also Vera–Lozano v. Int'l Broadcasting*, 50 F.3d 67, 71 (1st Cir.1995) ("For the party seeking to attack the amount of jury-awarded damages, the applicable standard of review is daunting. We will not disturb an award of damages for economic loss provided it does not violate the conscience of the court or strike such a dissonant chord that justice would be denied were the judgment permitted to stand.") (quotations omitted); *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 516 (7th Cir.1993) (holding that jury verdict may be vacated and new trial granted "only if the verdict is monstrously excessive or if there is no rational connection between the evidence on damages and the verdict") (quotations omitted). *See also Partington v. Broyhill Furniture Indus., Inc.*, 999 F.2d 269, 273 (7th Cir.1993) (holding that $18,000 back pay award was supported by sufficient evidence, and observing that "[t]o make a plaintiff prove the amount of back pay to which he is entitled with the same meticulous care . . . as if he were seeking a judgment of $100 million would be ludicrous").

■ It should be noted that the calculation of back pay for a discharged employee almost always involves ambiguity and requires some measure of "speculation." In the Title VII context, this court has dealt

---

4. In his brief, Aubry identifies the standard of review as "clearly erroneous." As a practical matter, there is no difference here. *See, e.g., Berger v. City of Mayfield Heights*, 265 F.3d 399, 402 (6th Cir.2001) ("An abuse of discretion exists when the district court applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact.").

with such ambiguity by holding that "[b]ackpay should be awarded even where the precise amount of the award cannot be determined, with any ambiguities being resolved against the discriminating employer." *Wooldridge v. Marlene Industries Corp.*, 875 F.2d 540, 549 (6th Cir.1989). Similarly, in this breach-of-contract action, the fact that some speculation is necessary to calculate Lovely's damages does not justify setting aside the jury's verdict.

■ We reject Aubry's contention that Lovely's calculation, premised on continuous employment by D & D for 18 months at 40 hours per week, constitutes an "assumption" that has no support in the record. Aubry argues that the trial testimony shows that construction industry workers like Lovely work only intermittently and are routinely laid off. However, Lovely testified that, during the nine months he was employed by D & D, he worked continuously, with the exception of a single six to eight day period in January while the company awaited a shipment of rail. Lovely also testified that, during that time, he regularly worked 40 hours per week or *more*.[5] From that testimony, particularly in the absence of *specific* evidence suggesting a contrary inference, a reasonable juror could conclude that, had he not been fired, Lovely's experience with D & D between April 15, 1997, and December 23, 1998, would have been similar. In fact, Lovely's foreman, Tom Lewis, affirmed that available work was generally "pretty steady" through 1998, with work tapering off thereafter.

■ We are similarly unpersuaded by Aubry's contention that, even absent the improper firing in April 1997, Lovely would have been laid off a month later on May 14, when an apparent work slow-down reduced the number of millwrights employed by D & D. In so arguing, Aubry ignores the testimony of foreman Lewis, who survived the lay-off and stated that his preference was to keep Lovely on the job as long as there was available work. Lewis testified that when there was a work slow-down, as there was from time to time, core millwrights would be told not to come to work for a week or two and then would be ordered to return as work became available. According to Lewis, such core workers would not be permanently laid off. From this testimony, along with the testimony that available work was "pretty steady" during 1997–98, the jury could well have found that Lovely would have survived the May 14 lay-off, or at least returned to work at D & D for some—if not all—of the months before he was permanently disabled in December 1998.[6]

In *Farber*, we reversed the district court's remittitur of a jury's damages award where the damages awarded by the jury reflected the testimony of the plaintiff as to the maximum due her. 917 F.2d at 1395–96. Although "the evidence was conflicting, the jury apparently chose to give full credit to [the plaintiff's] testimony ...." *Id.* at 1396. Here, in reaching its verdict on damages, the jury apparently

---

5. The damages calculation offered by Lovely, and adopted by the jury, presumes that Lovely worked no more than 40 hours per week. There is evidence in the record, however, that Lovely often worked longer hours and received time-and-a-half pay for overtime. Although Aubry argues it was improper speculation for the jury to assume 40–hour work weeks, the jury might easily have found, based on the evidence, that Lovely would have worked even more.

6. Lewis testified that he could trust Lovely as a foreman and that he resisted union pressure to lay him off prior to April 1997 because Lovely "d[id] the work we asked him to do, [and] he was available for work when we needed it ...."

did the same. Given that a trial court "abuses its discretion in ordering ... [a] new trial when the amount of the verdict turns upon conflicting evidence and the credibility of witnesses," *id.* at 1395, we simply cannot say that the district erred in denying the motion for a new trial in this case.

## CONCLUSION

For the reasons set out above, we AFFIRM the judgment of the district court.