**<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>**

File Name: 17a0126n.06

Case No. 16-5180

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Feb 24, 2017

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CHERYL A. WHITE, | ) | |
| | ) | |
|     Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| COVENTRY HEALTH AND LIFE | ) | KENTUCKY |
| INSURANCE COMPANY; LISA | ) | |
| CHANDLER; JENNIFER HATCHETT; | ) | |
| DEBORAH PENNINGTON; BELINDA | ) | |
| LONEGRAN; PATRICK MURRAY, | ) | |
| | ) | |
|     Defendants-Appellees. | ) | |

BEFORE: DAUGHTREY, ROGERS, and COOK, Circuit Judges.

COOK, Circuit Judge. Plaintiff Cheryl White claims that her former employer, defendant Coventry Health and Life Insurance Company, violated her civil rights under Kentucky law by discriminating against her on the basis of race, sex, and age, and retaliating against her for engaging in protected activity. Because she has not pleaded sufficient facts to raise a plausible inference of discrimination or retaliation, we affirm the district court's grant of Coventry's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

I.

White is a native Hawaiian woman in her fifties. Starting in 2011, she worked as a Network Operations Manager for Coventry Insurance Company. In September 2012, she "received a confusing email, making it unclear to [White] whether her presence was needed" at a meeting. When she failed to attend, she "received an email from Defendant Chandler chastising her." Yet "no such emails were issued when [White's] Caucasian male counterpart, younger employees, and other non-minority employees missed such a meeting." Further, "through a lack of communication overall at Defendant Coventry," her "name was attached to different projects and tasks" that she wasn't responsible for.

In October 2012, White filed a workers' compensation claim. Immediately thereafter, she received "complaints [about] the submission of missing Provider Medicaid ID numbers, of which [White] was neither involved with nor had any control over, and that [White's] perfume was too strong."

A few months later, Coventry's Vice President counseled her "that if she wanted to apply for a different position, she had to do it before she was written up for alleged[ly] not living up to expectations." He further "discussed the problem areas in her department, and how her alleged lack of understanding of the department caused ripple effects." When she asked him why Coventry did not fire her, he responded that "[t]he company . . . is afraid of being sued by someone that is over 50, a minority, and a female." Three days later he issued her "a written warning for allegedly not living up to expectations."

At some point following the counseling, she applied "for the position of manager in the Provider Relations Department," but "never received any response whatsoever" regarding the

position.  She spoke with "several other employees, and was told that there had been 'no qualified candidates,'" even though White "had significant experience."

Around the same time, Defendant Murray became White's supervisor.  The complaint alleges that Murray didn't understand the "ins and outs of [White's] department," and that Murray's inexperience, coupled with the recent shuffling of supervisors, "created a confusing environment for [White] and her staff."  The "problems created by Defendant Murray resulted in [White] being accused of not knowing her job" and "constant harassment" by her supervisors.  She complained "about the hostile work environment" to an HR representative, but the complaint garnered no response.

She also claims that a co-worker "verbal[ly] assault[ed]" her during a conference call.  The co-worker "cursed at [her] repeatedly" "because [White] allegedly submit[ed] reports with missing Provider Medicaid ID numbers."  Coventry's Chief Financial Officer, who was present on the call, "failed to correct this rude and unprofessional behavior."

In addition, her supervisors' criticism "became much more frequent and involved areas of the department [White] was not responsible for."  To illustrate, White says that she attended several mandatory meetings where she was "required to give answers to questions for areas of the department her Caucasian male counterpart, Mike Montgomery, was responsible for knowing, yet he was rarely present at these meetings."  According to the complaint, Montgomery "was never even reprimanded for missing these meetings."

In January 2013, Murray told White that "she had lost her credibility and had an attitude of irresponsibility."  A few days later, after being "diagnosed with severe depression stemming from her traumatic work situation," White submitted her letter of resignation.  After she tendered her resignation, an HR representative told her, "We don't want you to work in a hostile work

environment; please work at home for the remainder of your employment." The next day Murray stripped her of "authority regarding decision-making as to who would be assigned to what project, and the prioritization of projects."

White brought suit against Coventry and five of her co-workers and supervisors, alleging: 1) unlawful retaliation for filing a workers' compensation claim, Ky. Rev. Stat. Ann. § 342.197; 2) discrimination on the basis of race, gender, and age, *id.* § 344.040; 3) unlawful retaliation for filing a complaint about race, sex, and age discrimination, *id*. § 344.280; and 4) common law promissory estoppel. The district court dismissed the complaint for failure to state a plausible claim for relief, reasoning in part: 1) that the allegations were too conclusory and innocuous to constitute either retaliation or discrimination; and 2) that the complaint included negligible factual content connecting the alleged harassment to any protected characteristic.

## II.

We review de novo the district court's grant of a motion to dismiss for failure to state a claim. *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (citing *Pedreira v. Ky. Baptist Homes for Children, Inc.*, 579 F.3d 722, 727 (6th Cir. 2009)). With winnowing pen in hand, we begin by sorting the complaint's well-pleaded factual allegations from its legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And then, accepting the factual allegations as true and construing the complaint most favorably to the plaintiff, *id.*, we decide whether the complaint's factual allegations "raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). To survive a motion to dismiss, "[t]he complaint must [] contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *DiGeronimo Aggregates, LLC v. Zemla*, 763 F.3d 506, 509 (6th Cir. 2014)

(alteration in original) (quoting *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 538 (6th Cir. 2012)).

III.

A.       *Retaliation Under the Kentucky Workers' Compensation Act & Kentucky Civil Rights Act*

White alleges that Coventry retaliated against her because she filed a workers' compensation claim and complained about the hostile work environment. Kentucky law provides that "[n]o employee shall be harassed, coerced, discharged, or discriminated against in any manner whatsoever for filing and pursuing a [workers' compensation] claim." Ky. Rev. Stat. Ann. § 342.197. The Kentucky Civil Rights Act (KCRA) similarly prohibits employers from retaliating against employees who file a discrimination complaint. *Id.* § 344.280. These provisions prohibit only "materially adverse" employment actions, *i.e.*, actions that are "harmful to the point that they could well dissuade a reasonable worker from making or supporting" a complaint. *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006); *see Brooks v. Lexington-Fayette Urban Cty. Hous. Auth.*, 132 S.W.3d 790, 801–02 (Ky. 2004) (applying federal precedent to interpret Kentucky's retaliation provisions).[1]

White points to three allegations in the complaint that she contends show materially adverse treatment: 1) in January 2013, Murray held meetings with White's staff that "served to strip all of [her] authority regarding decision-making as to who would be assigned to what project, and the prioritization of projects," 2) "immediately following her Workman's

_____

[1] In *Brooks*, the Kentucky Supreme Court held that the definition of retaliation is the same under both federal and state law. At the time, however, the Sixth Circuit interpreted federal law to require "a materially adverse change in the terms and conditions of [a plaintiff's] employment." *Brooks*, 132 S.W.3d at 802 (quoting *Hollins v. Atl. Co.*, 188 F.3d 652, 662 (6th Cir. 1999)). In *White,* the Supreme Court overturned this narrow definition. *White*, 548 U.S. at 57. We need not determine whether Kentucky continues to ascribe to the pre-*White* definition because the claim fails even under the more forgiving standard.

Compensation claim," she received "complaints [about] the submission of missing Provider Medicaid ID numbers, of which [she] was neither involved with nor had any control over"; and 3) someone complained "that [White's] perfume was too strong, the same perfume she had worn every day since she was hired."

These allegations fail to plausibly show that White suffered a materially adverse employment action. White resigned from Coventry on January 21, 2013. According to the complaint's timeline, the meetings between Murray and members of White's staff began the next day. The common sense explanation is that Coventry divested her authority because she resigned. Plus, it is not illegal harassment when an insurance company censures its employee for failing to follow its protocols—here, providing Medicaid ID numbers. White points to no case holding otherwise. Finally, her perfume allegation leaves too much unsaid. It doesn't: say who— boss, colleague, or subordinate—commented on her perfume; connect the comment to her complaints; or aver facts from which we could find the remark would dissuade a reasonable employee from filing a claim. In short, even assuming everything she asserts to be true—as we must at this stage—she fails to plead a plausible retaliation claim.

B.      *Discrimination Based on Sex, Race, and Age*

The KCRA makes it an unlawful practice for an employer "[t]o fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment," because of the individual's race, sex, or age. Ky. Rev. Stat. Ann. § 344.040(1)(a). We apply Title VII precedent when analyzing a claim of discrimination under the KCRA. *Pedreira*, 579 F.3d at 727 (citing *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 434 (6th Cir. 2009)). An employer discriminates against an employee

when it adversely changes the terms or conditions of employment because an employee is a member of a protected group. *See Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 625 (6th Cir. 2013).

In support of her claim that Coventry discriminated against her, White points to the following: 1) "Plaintiff received an email from Defendant Chandler chastising her for missing a meeting, for which Plaintiff received a confusing email, making it unclear to Plaintiff whether her presence was needed, yet no such emails were issued when Plaintiff's Caucasian male counterpart, younger employees, and other non-minority employees missed such a meeting;" 2) "in several meetings where attendance was mandatory, Plaintiff was required to give answers to questions for areas of the department her Caucasian male counterpart, Mike Montgomery, was responsible for knowing, yet, he was rarely present at these meetings" and "was never even reprimanded for missing these meetings;" 3) she "appl[ied] for the position of manager in the Provider Relations Department, but, never received any response whatsoever from Defendant Coventry in regard to the position;" and 4) when she asked her boss why the company hadn't yet fired her, he responded that "[w]e can't fire you. The company (Defendant Coventry) is afraid of being sued by someone that is over 50, a minority, and female."

These allegations do not show a need for the trial court to inquire further into whether Coventry unlawfully discriminated against White. *First*, it is not an adverse employment action for an employer to chastise a manager for missing a meeting, or to question a manager about her department, even if she is not ultimately responsible for the answers. Indeed, White cites no case holding that such unremarkable criticism constitutes an adverse action under the KCRA or Title VII. *Second*, the complaint lacks facts from which the court could infer that she was qualified to manage the Provider Relations Department. White's only response is that *she* thought she was qualified, hence why she applied. But we need not credit this "[t]hreadbare recital[]" of an

element necessary to state a failure-to-hire claim. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). *Last*, that her boss worried about a potential lawsuit, at most, shows the employer's grasp of the litigation risk in firing a protected-group employee. *See Partington v. Broyhill Furniture Indus.*, 999 F.2d 269, 271 (7th Cir. 1993).

Other allegations, though arguably well-pleaded, offer little from which a trier-of-fact could infer race, sex, or age based discrimination. For example, she claims that during her counseling with Coventry's Vice President, he "discussed the problem areas in her department, and how her alleged lack of understanding of the department caused ripple effects." She avers that Murray "accused [her] of not knowing her job." And she contends that Pennington "cursed at [her] repeatedly in the presence of [a] co-worker . . . because Plaintiff allegedly submitt[ed] reports with missing Provider Medicaid ID numbers."

Put simply, none of these events, either independently or in combination, constituted an adverse change in the terms and conditions of her employment. Nor has she included facts from which we could infer that the criticism related to her race, sex, or age.

White's remaining allegations are wholly conclusory. For example, she posits that "almost from the very beginning of [her] employment she suffered from harassment, discrimination, intimidation, berating and a hostile work environment," that she was "constantly berated" by a supervisor, and that Murray "degraded and humiliated" her. Such naked assertions add nothing to the complaint's sufficiency. *See Iqbal*, 556 U.S. at 678.

White seeks to analogize her complaint to the complaint in *Keys v. Humana, Inc.*, 684 F.3d 605 (6th Cir. 2012). But in that case, an African-American female plaintiff offered multiple "specific adverse employment actions"—her white colleagues in identical positions were given a different title and paid more, the employer demoted her despite meeting

performance expectations, and "ten to twelve African American manager-level employees were placed on performance plans and then forced to resign or were terminated." *Id.* at 607, 610. We glean no comparable adverse employment actions from White's complaint.

*C.     Promissory Estoppel*

White also maintains that Coventry is liable under a theory of promissory estoppel. Under Kentucky Law, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Sawyer v. Mills*, 295 S.W.3d 79, 89 (Ky. 2009) (quoting *Meade Constr. Co. v. Mansfield Commercial Elec., Inc.*, 579 S.W.2d 105, 106 (Ky. 1979)).

According to her complaint, Coventry "utilizes a progressive disciplinary system that mandates an employee receive a verbal warning before a written warning can be issued, and has anti-discrimination and retaliation policies." By "failing to issue a verbal warning before a written warning, and practicing discrimination and retaliation, [Coventry] failed to live up to those promises."

This states no plausible promissory estoppel claim. Indeed, the complaint lacks any facts showing how White relied on Coventry's promise to use a progressive disciplinary system. Moreover, her allegations acknowledge that Coventry's Vice President "counseled" her in 2012, told her "that if she wanted to apply for a different position, she had to do it before she was written up for alleged[ly] not living up to expectations," and "discussed the problem areas in her department, and how her alleged lack of understanding of the department caused ripple effects." It is hard to discern how this could be interpreted as anything other than a verbal warning.

Further, to the extent that her claim turns on Coventry's anti-discrimination and retaliation policies, it fails for the reasons already discussed.

IV.

For the above reasons, we affirm the district court's dismissal of White's complaint.