In re **BROADVIEW LUMBER COMPANY, INC., Debtor.**

**Thomas J. O'NEAL, Trustee, Plaintiff,**

v.

**SOUTHWEST MISSOURI BANK OF CARTHAGE, and Mercantile Bank of Joplin, and Richard Mansfield and Jenny Mansfield, Defendants.**

**Bankruptcy No. 91–30593.**
**Adv. No. 93–3018.**

United States Bankruptcy Court,
W.D. Missouri,
Southwestern Division.

June 28, 1994.

---

Thomas J. O'Neal, Bussell, O'Neal & Hall, Springfield, MO, for plaintiff.

John J. Podeleski, Douglas K. Crandall, Crandall & Dally, Carthage, MO, for Southwest Missouri Bank.

John R. Sims, Sims, Bridges & Dolence, Neosho, MO, for Richard and Jenny Mansfield.

Tom K. Noland, Spencer, Scott & Dwyer, Joplin, MO, for Mercantile Bank of Joplin.

### AMENDED MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Bankruptcy Judge.

Thomas J. O'Neal, the Chapter 7 trustee in this involuntary bankruptcy (the "trustee"), brings an adversary proceeding against Southwest Missouri Bank of Carthage, Missouri ("SMB"), Mercantile Bank of Joplin, Missouri ("Mercantile") and Richard and Jenny Mansfield (the "Mansfields"). This is a core proceeding under 28 U.S.C. § 157(b)(2)(E) and (F) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1).

This adversary proceeding involves the interaction of debtor, Broadview Lumber Company, Inc. ("Broadview"), its President Richard Mansfield, ("Mansfield"), SMB, and Mercantile. Put simply, the issues are whether Mr. Mansfield looted the debtor, and whether either of the defendant banks made such looting possible.

The following shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52 as made applicable to this adversary action by Federal Rule of Bankruptcy Procedure 7052. Because the trustee asks for separate relief as to different groups of defendants, I will treat each group separately. All references to "the Complaint" are to the Second Amended Complaint, filed February 14, 1994.

### I. TRUSTEE v. RICHARD MANSFIELD

#### A. The Debtor and Mansfield's Debt Structures

Prior to January 1991, Broadview was a wholesale lumber brokerage firm that had been doing business in Carthage, Missouri since 1905. Mansfield was an employee of Broadview from 1962 until 1977, when he succeeded Frank N. Jones, Sr. as president. By 1990, Mansfield owned fifty percent of the stock of Broadview, which had five other stockholders, none of whom is either related to Mansfield or a party in this litigation. Pl.Ex. 64. Mansfield was authorized a salary of $11,550.00 per month by the Board of Directors on November 11, 1986. Mansfield testified that he voluntarily reduced the salary figure to $8,500.00 during 1990 because a number of directors felt he was being overcompensated. As president, Richard Mansfield caused Broadview to borrow $300,000.00 from SMB on August 13, 1984, secured by a lien on real estate owned by Broadview. Pl. Exh. # 86. The loan was guaranteed by the Small Business Administration ("SBA") up to ninety percent of its value. Mansfield signed a personal guarantee on the portion of the loan guaranteed by the SBA. Pl.Exh. # 88. Debtor maintained its corporate checking account at SMB.

Broadview's primary financing immediately prior to 1991 was supplied by Fidelcorp, an asset-based lender, using a formula for advancing monies against account receivables up to a limit of four and one/half million

dollars. This line of credit was personally guaranteed by Mansfield. The CIT Group ("CIT") acquired Fidelcorp sometime before January 1, 1991. Mansfield testified that debtor had often been out of formula in the past but Fidelcorp had continued to advance funds until debtor could stabilize its cash flow.

### B. Events of January–May 1991

Without apparent notice, CIT refused to advance further funds on January 2, 1991. Broadview had issued over $400,000.00 in checks with no funds to back them up and was almost immediately forced to cease operations. Mansfield attempted to find an alternative source of funding, but realized by January 7, 1991, that Broadview would have to close its doors.

Mansfield informed Gary Denny, the President of SMB, that Broadview was ceasing to do business. Denny also testified that it was general knowledge in the bank that debtor had closed its doors. From January through May 9, 1991, Mansfield worked only for Broadview. During this time he liquidated inventory and collected receivables sufficient to pay off the guaranteed CIT obligation. By April 1991, the loan to CIT had been fully repaid.

By May, 1991, Mansfield and his wife Jenny Mansfield had started a new business called Capital Funds. Mansfield began taking telephone calls at the number listed for Capital Funds at approximately this same time.[1] Thereafter, Mansfield continued to make efforts to collect monies owed to Broadview, however, not all the monies collected were made available to Broadview and its creditors. In addition, Mansfield continued to seek buyers for the Broadview office building to eliminate the other debt personally guaranteed by him.

### C. Settlement With Unsecured Creditors

As of January 2, 1991, debtor had approximately 1.3 million dollars in unsecured trade debt. After the CIT loan had been satisfied, Mansfield was still attempting to sell debtor's real estate, and he was being besieged by calls from trade creditors. He, therefore, retained the services of both an accountant and an attorney to advise him while he continued to wind up the affairs of Broadview. An out-of-court settlement proposal was developed by the attorney to deal with the unsecured creditors. Between January and August of 1991 Richard Mansfield informed all the unsecured creditors that Broadview was no longer in business and that he was attempting to collect accounts receivables to pay outstanding debts. Richard Campbell, an unsecured creditor, filed suit against Broadview in the Circuit Court of Jasper County, Missouri and that suit was set for summary judgment on July 30, 1991. Mansfield stated he was concerned that judgment creditors would attempt to garnish debtor's bank account at SMB. For that reason he wire transferred $263,630.00 from SMB to account number 52–795–5 at Bank IV of Pittsburg, N.A. ("Bank IV") on July 15, 1991.[2] Then, on September 6, 1991, Mansfield transferred the sum of $235,931.86 from Bank IV account number 52–795–5 into Bank IV account number 12–736–1. Mansfield intended to distribute only the $235,931.86 from account number 12–736–1 to the unsecured creditors pro rata, and to keep the rest. On August 30, 1991, Broadview sent a letter and check drawn on Bank IV account number 12–736–1 to each unsecured creditor proposing payment of approximately 16.6% in full accord and satisfaction of debt. Pl. Exh. # 180. A number of the unsecured creditors accepted this payment, however, others either returned the checks, held the checks, or cashed the checks with a disclaimer that the payment was not being accepted in full accord and satisfaction. Before all checks had cleared from Bank IV account

---

1. Richard and Jenny Mansfield opened a checking account at SMB named Capital Funds, account number 020–573–5093 ("account no. 5093"), on April 19, 1991. Def.Exh. # F.

2. Mansfield testified that he believed debtor's corporate checking account at SMB was closed when SMB wire-transferred all the funds held in debtor's account to Bank IV. SMB's records indicate that the corporate checking account was, in fact, closed on April 8, 1992. Def.Exh. # D.

number 12–736–1, Kelly Truck Lines, an unsecured creditor, filed a writ of garnishment in aid of attachment and attached approximately $12,000.00 of the funds remaining in said account. Then, on September 26, 1991, Louisiana Pacific Corporation obtained a judgment against Broadview in excess of $80,000.00. Apparently concerned that Louisiana Pacific might also garnish the unclaimed funds, Richard Mansfield, on or about October 2, 1991, withdrew all funds held at Bank IV, totalling $61,722.96, in four cashier checks made payable to Broadview. Of those funds, he retained $25,000.00 which he now claims was salary due him. The remainder of the Bank IV funds, and additional funds that were later collected, were used to purchase cashier's checks from SMB. The bulk of those monies were ultimately diverted to Mansfield.

An involuntary bankruptcy was filed against Broadview on November 12, 1991, some ten months after it closed its doors.[3] Mansfield testified that at the time the bankruptcy was filed he was holding approximately $50,000.00 in cashier's checks made payable to debtor. On March 5, 1992, the Court held a conference with counsel for the petitioning creditors and Broadview. Thereafter, Broadview's counsel advised Mansfield that an Order granting the involuntary petition would be entered shortly. The next day, March 6, 1992, Mr. Mansfield went to SMB and caused two cashier's checks payable to Broadview, in the total amount of $19,743.77, to be deposited into his and his wife's personal account, leaving Broadview with no available cash. That same day, bankruptcy relief was granted by the Court. Mansfield advised his counsel that the company had no money as of November 12, 1991.[4] Broadview therefore filed schedules and a statement of affairs which listed unsecured claims of $1,596,915.33, and assets of $20,000.00 in real property and $5,000.00 in personal property as of November 12, 1991. The schedules do not list the cashier's checks made payable to debtor which were being held by Mansfield on November 12, 1991.

### D. The Trustee's Preference Actions Against Richard Mansfield

#### 1. The January—May 1991 Salary and Expense Payments

The Trustee in Count VI seeks to recover certain payments that Mansfield caused Broadview to make to him within one year of the petition. Mansfield testified that he routinely did not draw a salary for the fourth quarter of a given year, preferring to take his salary for October, November, and December in January of the following year for income tax purposes. Therefore, on January 2, 1991, a check was drawn to Mansfield from Broadview in the sum of $19,388.03. Pl.Ex. # 95. In addition, Mansfield received payments from Broadview up to and including May 9, 1991, for salary and expense reimbursements. The Trustee seeks to recover these payments, totalling $40,904.36 as well.[5]

Section 547(b) grants the bankruptcy trustee the power to "avoid the transfer to a creditor of an interest in property of the debtor that is made (1) on or within ninety days [or one year if the creditor is an insider] before the date of the filing of the bankruptcy petition, (2) while the debtor was insolvent, (3) on account of an antecedent debt, and (4) which enables the creditor to receive more than it would have received in a bankruptcy liquidation." *Lovett v. St. Johnsbury*

---

3. Mansfield was served with the involuntary petition on November 18, 1991.

4. Mansfield also did not tell his counsel that the company had received $17,303.37 from CIT on November 25, 1991, after the filing of the involuntary. Those funds represented an overpayment of the prior obligation to CIT. Such funds, along with another $2,000.00, ended up being deposited to the Mansfields' construction account at Mercantile, as discussed *infra*.

5. Mansfield received the following payments from Broadview:

| | |
|---|---|
| 1/02/91 | $19,388.03 |
| 1/15/91 | 191.83 |
| 2/14/91 | 6,115.64 |
| 3/14/91 | 5,931.36 |
| 4/09/91 | 5,893.60 |
| 5/09/91 | 3,383.90 |
| Total | $40,904.36 |

Note that the trustee made no claim to the $25,000.00 retained by Mansfield as salary for the period from May 9, 1991 until October 2, 1991.

*Trucking,* 931 F.2d 494, 497 (8th Cir.1991).[6] The trustee has the burden of proving that a transfer is voidable as preferential under section 547(b). *See* 11 U.S.C. § 547(g); *Brown v. First Nat'l Bank of Little Rock,* 748 F.2d 490, 491 (8th Cir.1984). Mansfield claims the six transfers totalling $40,904.36 were reimbursement for salary and expenses to which he was entitled in the ordinary course of debtor's business. Section 547(c)(2) provides that:

(c) The trustee may not avoid ... a transfer—

. . . . .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor made in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2)(A). Mansfield must thus prove that the three statutory elements above have been satisfied in order to except the transfers from the trustee's avoiding power. *Jones v. United Savings and Loan Ass'n (In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.),* 9 F.3d 680, 682 (8th Cir. 1993). I find as to the $40,904.36 in wages and expenses, that Broadview incurred the debt to Mansfield in the ordinary course of business. The payroll records of debtor for 1990 indicate that Mansfield drew no salary for October, November, and December of 1990. *See* Pl.Exh. # 95. As he had done in prior years, he pushed that salary to the

following year for tax reasons. Mansfield also testified that winter is a slow season in construction-related industries, such as lumber, and deferment of income aided debtor's cash flow. Further, Mansfield testified that he devoted all his efforts to debtor's liquidation, including trying to sell the business and/or real estate, in the first five months of 1991. During that period of time, he collected accounts receivable sufficient to satisfy CIT's two million dollar claim. He began negotiations with the SBA to satisfy its secured claim as well. He answered inquiries about the status of debtor and its unsecured creditors. He began efforts to settle the claims of the unsecureds. He worked for Broadview full-time, and for his efforts he received his usual and customary salary paid in the usual and customary fashion. Thus the first element is satisfied.

As to the second element, there is no specific legal test to determine if debtor made the transfer within the ordinary course of business between the debtor and the transferee. *Eureka Springs* at 682–83. The Court must indulge in a "peculiarly factual" analysis of the specific practice between the parties. *Lovett v. St. Johnsbury Trucking (Transportation Systems International, Inc.),* 931 F.2d 494, 497 (8th Cir.1991). The creditor must be able to demonstrate some consistency between the transfers at issue and other transfers between the debtor and this creditor, which Mansfield has done as to these salary and expense payments. *Id.* Therefore, the second element is satisfied as well.

As to the third element of section 547(c), the creditor must prove that "payment is ordinary in relation to the standards prevailing in the relevant industry." *Eureka*

---

6. Section 547(b) reads as follows:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

*Springs* at 685 (quoting *Logan v. Basic Distribution Corp. (In re Fred Hawes Org., Inc.)* 957 F.2d 239, (6th Cir.1992)). The trustee did not dispute Mansfield's testimony that it was not an unusual practice to defer fourth quarter income, particularly in an industry that is cyclical in nature. I further find the salary and expense transfers to Mansfield between January 2, 1991, and May 9, 1991, in the amount of $40,904.36, were consistent with the salary and expense reimbursement to which he was entitled, and ordinary in relation to prevailing industry standards. Thus, as to that portion of Count VI of the Complaint, seeking recovery of those transfers, I find in favor of Mansfield.

### 2. The Pension Plan Repayment

■ Mansfield also drew a check in the sum of $9,750.52 on January 2, 1991, which he claimed was payment for an individual retirement account ("IRA"). Mansfield testified that when Broadview discontinued its pension plan he left his pension funds on deposit with debtor so he could borrow against them as needed. As a result, $9,750.52 remained on deposit on January 2, 1991. On that date, the same day he was notified that CIT was pulling the line of credit, he caused the company to write him a check for $9,750.52. The Trustee seeks recovery of that amount from Mansfield in Count VI as well.

This transfer is more problematic for Mr. Mansfield. Debtor discontinued its pension plan in 1988. At that time, employees were given three options: (1) rollover proceeds into an IRA; (2) rollover the proceeds into debtor's profit sharing 401(k) plan; or (3) withdraw the funds and pay taxes and penalty. Def.Exh. # 2. All of the other employees of debtor exercised one of the three options, however, Mansfield chose to leave his pension plan sums on deposit with debtor so he could withdraw monies and pay them back as needed. I find no accounting for such funds in the record. I find no evidence that Mansfield paid any taxes or penalty on the funds. I further find that such a practice was not in the ordinary course of business

between debtor and Mansfield. Thus, the transfer of $9,750.52 within one year of bankruptcy was a preferential transfer made in satisfaction of an antecedent debt while debtor was insolvent, not in the ordinary course of business. As such, the transfer is voidable. Therefore, I find in favor of the trustee on Count VI and enter judgment in the sum of $9,750.52.

### 3. The Accounting Claim Against Richard Mansfield

■ The trustee seeks an accounting from Mansfield for the sum of $31,235.19 on deposit at Bank IV account no. 12–736–1 until October 3, 1991, when it was withdrawn by Mansfield. The trustee also seeks turnover of said sum. No evidence was offered at trial that would trace this sum into an account of Richard Mansfield. Mansfield did testify that he retained $25,000.00 of the Bank IV monies as salary for 1991, and that he reflected such on his bankruptcy schedules. I find the trustee offered insufficient evidence for me to find that Mansfield converted the $31,235.19 prayed for in Count VII, therefore, I find for Mansfield as to this Count.

## II. TRUSTEE v. RICHARD MANSFIELD AND SOUTHWEST MISSOURI BANK

The events precipitating the Trustee's claims against SMB occurred after May 1991. However, the bank's knowledge of Broadview's financial situation is a critical element of the trustee's claim. Therefore, a brief background of the relationship among SMB, Broadview and the Mansfields is in order. Broadview opened its corporate checking account at SMB on August 13, 1984. SMB held an SBA guaranteed loan secured by Broadview's office building. In addition, Richard and Jenny Mansfield opened their personal checking account numbered 020–573–5082 ("account no. 5082") at SMB on December 9, 1987. The Mansfields themselves were obligated to SMB on a note which had a balance of $65,000.00 in 1988.[7]

7. The Mansfields borrowed $265,000.00 from SMB on February 20, 1987, secured by a residence on Whitten Road, stock in Broadview, and a Deed of Trust on real estate located at 1505

The note was secured by 679 shares of stock in Broadview [8] and by a Deed of Trust on a residence located at 1505 Grand Avenue, Carthage, Missouri (the "Grand Avenue House"). In 1990, the Mansfields decided to remove the existing house and build a new home on the Grand Avenue property. SMB declined to make a construction loan, but on October 31, 1990, released its Deed of Trust in order to allow the Mansfields to obtain such a loan from Mercantile. Pl.Exh. ## 112 and 104. Thus, when CIT pulled the plug on January 2, 1991, the only collateral for the Mansfields' obligation to SMB was essentially worthless Broadview stock.

SMB's officers and directors became aware of Broadview's demise during January, 1991, and were aware of it at all times thereafter.[9] Upon closing the business Mansfield immediately notified Gary Hoskins, a vice-president of SMB who handled his account, that the assets of Broadview were being liquidated, and that Mansfield himself would soon be out of work. Mansfield asked Hoskins for relief with respect to Broadview's, as well as his and his wife's, obligations to SMB. Mansfield asked SMB to reduce the payments on the personal loan from $1,000.00 per month to $750.00 per month. That request was granted at the Board of Directors' meeting on January 25, 1991. Pl.Exh. # 210. By February 15, 1992, the loan balance had been reduced to $52,331.75. On that date, the Mansfields signed a loan extension agreement with SMB. On February 15, 1993, the Mansfields again signed a loan extension agreement with SMB and granted SMB a second mortgage on the Grand Avenue House. Pl.Exh. # 104. At that time the balance due on the note was $47,517.30.

With respect to the Broadview loan, Mr. Hoskins notified the SBA in January, 1991, of Broadview's demise, and relayed a request from Mansfield for a sixty-day grace period in which to sell the office building which served as collateral. Broadview paid SMB

interest only on the loan from January 13, 1991, until September 13, 1991. On October 9, 1991, SMB assigned the loan to the SBA. Broadview agreed to let the SBA foreclose on the real estate, and the SBA agreed not to hold Mansfield liable on his personal guaranty.

By September 1991, Mansfield realized that some of Broadview's creditors had refused the accord and satisfaction, and he began sheltering debtor's remaining assets. He closed out the Bank IV accounts after a creditor found one of them on or about October 3, 1991. He then took the proceeds to SMB, and had SMB issue cashier's checks made payable to Broadview. From that point forward, Mansfield used the device of cashier's checks to shield Broadview's assets from creditors, thereby enabling him to siphon off a large portion of those monies for his benefit.

The transactions involving cashier's checks, which took place between September 24, 1991, and March 6, 1992, are the subject of the trustee's cause of action against Richard Mansfield and SMB for conversion. The transactions can be summarized as follows. A cashier's check made payable to debtor was purchased from SMB with funds made payable to debtor. That check then remained in Mansfield's personal possession. As a result, the funds were never deposited into Broadview's bank account at SMB and were, thus, not available to judgment creditors. When Mansfield wanted to use the funds the check was transferred to SMB. In exchange, SMB issued one or more of the following: (1) cash to Mansfield in the total sum of $1,881.97; (2) a cashier's check made payable to Mansfield in the sum of $5,896.46; (3) cashier's checks or money orders made payable to creditors of debtor in the total sum of $14,825.37; (4) deposits into Mansfield's account no. 5082 totalling $21,612.41;

Grand Avenue. At least a portion of the proceeds from this loan were used to purchase Broadview stock. The Whitten Road house sold in 1988, for $200,000.00.

**8.** In 1987, the Broadview Board of Directors valued such stock at $330.00 per share.

**9.** I note that on December 4, 1990 Mansfield, on behalf of Broadview, had applied to SMB for a $114,000.00 loan. The application was denied. Pl.Exh. # 206 and # 207.

(5) or deposits into Mansfield's account no. 5093 totalling $17,548.52.[10] The total of these transfers to Mansfield, not including amounts transferred to creditors, is $46,939.36. Of that total, $4,691.33 is pre-petition and $42,248.03 is post-petition. Each cashier's check was signed by a designated representative of SMB.

10. The proceeds of the cashier's checks can be traced as follows:

Cashier's check no. 20425 in the amount of $6210.83 purchased September 24, 1991, was endorsed over to SMB on October 9, 1991. In exchange, SMB deposited $2,000.00 in the Mansfield account no. 5082, delivered $1,000.00 in cash to Richard Mansfield, and issued cashier's check no. 20248 in the amount of $3,210.83 payable to debtor.

On November 7, 1991, Mansfield transferred cashier's check no. 20248 in the amount of $3,210.83 to SMB. In exchange, SMB issued three money orders payable to unsecured creditors and deposited the sum of $691.33 into Mansfield account no. 5093.

On October 3, 1991, Bank IV issued cashier's check no. 114911 in the amount of $31,235.19 payable to the debtor and purchased with the remaining funds in Bank IV account no. 12–736–1. Mansfield used cashier's check 114911 to purchase cashier's check no. 20525 in the amount of $15,732.93 on October 16, 1991 payable to the debtor. On January 28, 1992, Mansfield transferred cashier's check no. 20525 in the amount of $15,732.93 payable to the debtor to SMB. In exchange, SMB issued a money order payable to a creditor, delivered $250.00 in cash to Mansfield and issued cashier's check no. 21108 payable to the debtor in the amount of $15,432.93.

On February 6, 1992, Mansfield transferred cashier's check no. 21108 in the amount of $15,432.93 to SMB. In exchange, SMB issued a money order payable to a creditor and issued cashier's check no. 21167 payable to debtor in the amount of $13,847.31.

On March 6, 1992, Mansfield transferred cashier's check no. 21167 in the amount of $13,847.31 and payable to the debtor to SMB and SMB credited Mansfield account 5093 with the amount of $13,847.31.

Bank IV issued cashier's check no. 114583 payable to debtor and purchases with funds from Bank IV account no. 52–795–5. On October 16, 1991, Mansfield used cashier's check 114583 in the amount of $10,000.00 to purchase cashier's check no. 20528 in the amount of $10,000.00. On November 18, 1991, Mansfield transferred cashier's check no. 20528 in the amount of $10,000.00 payable to debtor to SMB. In exchange, SMB issued money orders payable to creditors, deposited the sum of $600.00 in Mansfield account no. 5093, and issued cashier's check no. 20669 in the amount of $6,639.80 payable to the debtor. On December 2, 1991, Mansfield transferred cashier's check no. 20669 in the amount of $6,639.80 to SMB. In exchange, SMB deposited $1,900.00 into Mansfield account no. 5082, deposited $600.00 into Mansfield account no. 5093, issued a money order payable to a creditor, and issued cashier's check no. 20720 in the amount of $3,989.80 payable to the debtor. On December 4, 1991, Mansfield transferred cashier's check no. 20720 in the amount of $3,989.80 to SMB. In exchange, SMB issued two cashier's checks to creditors and is unable to account for $231.97 unless it was delivered in cash to Mansfield.

Bank IV issued cashier's check no. 114582 in the amount of $10,000.00 payable to the debtor and purchased with funds from Bank IV account no. 52–795–5. On October 16, 1991, cashier's check no. 20527 in the amount of $10,000.00 payable to debtor was purchased with cashier's check no. 114582. On January 3, 1992, Mansfield transferred cashier's check no. 20527 in the amount of $10,000.00 to SMB. In exchange, SMB deposited the sum of $3,200.00 into Mansfield account no. 5082, issued money orders payable to creditors, and issued cashier's check no. 20942 in the amount of $5,896.46 payable to Richard Mansfield. SMB credited Mansfield's account no. 5093 with the sum of $5,896.46 on March 6, 1992.

Cashier's check no. 20574 in the amount of $4,000.00 dated October 23, 1991 payable to the debtor was purchased with funds received from an account receivable. On October 31, 1991, Mansfield transferred cashier's check no. 20574 in the amount of $4,000.00 to SMB. In exchange, SMB issued money orders to creditors, credited Mansfield's account no. 5082 with $600.00, delivered $400.00 in cash to Mansfield, and issued bank money order no. 68677 in the amount of $809.88 payable to debtor. On December 17, 1991, Mansfield transferred money order no. 68677 in the amount of $809.88 payable to debtor to SMB and SMB credited Mansfield's account no. 5093 with $809.88.

Cashier's check no. 20208 in the amount of $15,800.71, dated October 2, 1991, made payable to debtor, was purchased from SMB with funds from accounts receivable. On January 17, 1992, Mansfield transferred cashier's check no. 20208 in the amount of $15,800.71 payable to debtor to SMB. In exchange, SMB deposited the sum of $1,000.00 into Mansfield account no. 5093 and issued cashier's check no. 21047 in the amount of $14,800.71 payable to debtor. On January 31, 1992, Mansfield transferred cashier's check no. 21047 in the amount of $14,800.71 to SMB. In exchange, SMB deposited $3,500.00 into Mansfield's account no. 5082 and issued cashier's check no. 21146 in the amount of $11,300.71 payable to debtor. On February 24, 1992, Mansfield transferred cashier's check no. 21146 in the amount of $11,300.71 payable to debtor to SMB. In exchange, SMB issued a money order payable to a creditor and deposited the sum of $10,412.41 into Mansfield account no. 5082.

The Trustee in Counts I and II seeks to recover from SMB and Richard Mansfield the funds paid to Mansfield as a result of these transactions.

### A. The Conversion Count as to Richard and Jenny Mansfield

■ Count I of the Complaint prays for relief from both Richard and Jenny Mansfield for conversion of debtor's property. No evidence was presented at trial implicating Jenny Mansfield of any conversion. Therefore, as to the conversion claim in Count I of the Complaint, I find in favor of Jenny Mansfield.

■ Conversion is the wrongful exercise of dominion or ownership over property which belongs to another. *United Missouri Bank South v. United States*, 423 F.Supp. 571, 575 (W.D.Mo.1976) *Victor Federal Savings & Loan v. Robison (In re Robison)*, 86 B.R. 182, 183 (Bankr.W.D.Mo.1988); *Ensminger v. Burton*, 805 S.W.2d 207, 210–11 (Mo.Ct.App.1991). Conversion is a strict liability tort and it is no defense to claim that the act was done in good faith or in the honest belief that the transaction was lawful. *Ensminger* at 211. The wronged party often makes a demand for the return of the property; however, such demand and refusal is not required if some independent act of conversion is in evidence. *United Missouri Bank* at 576. Richard Mansfield does not deny that between October 9, 1991, and March 6, 1992, he deposited funds made payable to debtor into either his account no. 5082 in the amount of $21,612.41 or his account no. 5093 in the amount of $17,548.52. Nor does he deny he received the proceeds of cashiers checks made payable to the debtor in the form of cash in the sum of $1,881.97.[11] As an affirmative defense to these actions, Mansfield testified that at all times he considered himself to still be acting as president of debtor, and therefore authorized to act on behalf of debtor. He also testified that he believed he was entitled to a salary for any efforts he expended on behalf of debtor. First, I have already found that any efforts Mansfield expended on behalf of debtor after May 9, 1991, were for his own benefit, not for the benefit of debtor or its creditors. Second, the bankruptcy schedules which were filed with this Court on June 10, 1992, indicate that Mansfield paid himself a salary of $75,000.00 for the year preceding the filing of the involuntary petition. Pl.Exh. # 196. After the order for relief was entered on March 6, 1992, he never petitioned this Court for the authority to collect any further salary. Third, Mansfield did not declare any of these monies as income on his tax returns, or cause Broadview to withhold or file tax returns with respect to them. And lastly, even assuming the payments were sums properly earned by Mansfield, by depositing funds made payable to debtor into his personal checking accounts at SMB or cashing checks made payable to debtor and taking some of those proceed as cash payments, Mansfield, by definition, converted property of the debtor valued at $46,939.36, thereby breaching his fiduciary duty to such debtor. Therefore, as to the portion of the funds prayed for in Count I and covered by this discussion, I find in favor of the trustee. Judgment will be entered against Richard Mansfield in the sum of $46,939.36.[12]

### B. The Conversion Count as to Southwest Missouri Bank

The conversion Count as to SMB will be discussed *infra* in conjunction with the conversion count as to Mercantile.

### III. TRUSTEE v. MERCANTILE AND THE MANSFIELDS

This Section relates primarily to monies used in the construction of the Mansfields' residence, including the role of Mercantile. Since that requires discussion of the law of conversion, the actions for conversion against both Mercantile and SMB are discussed together.

---

11. Included in the trustee's cause of action against Mansfield for conversion are funds expended by debtor for materials which Mansfield used in his home. The materials used in construction of the home will be discussed *infra*.

12. The remaining funds sought by the trustee in Count I will be discussed *infra*.

The trustee's claims against Mercantile are all related to the transfer of one cashier's check on January 21, 1992. The trustee seeks $19,303.37 from Mercantile and the Mansfields, representing monies which Mercantile allowed Richard Mansfield to take from Broadview and use in the construction of the Mansfield's residence. He also seeks to recover from both Mansfields other monies of Broadview allegedly used to pay for construction of such residence, and taken by Richard Mansfield without the assistance of Mercantile. He further seeks to impose a constructive trust and/or equitable lien against the residence, superior to the interests of the Mansfields and Mercantile.

On September 24, 1990, Richard and Jenny Mansfield applied for a construction loan from Mercantile in an amount not to exceed $180,000.00. Pl.Exh. # 122. The application apparently was approved on October 9, 1990. On November 21, 1990, the Mansfields opened construction account number 766062 at Mercantile Bank of Joplin (the "construction account"). Merc.'s Exh. # 1. The construction loan required the Mansfields to invest $60,000.00 of their own funds. On February 11, 1990, Mansfield informed John Harrell of Mercantile that Broadview was out of business. Mercantile had expended approximately $30,000.00 toward the construction at that time. Mansfield expressed a desire to complete the house. He assured Harrell that both he and his wife would get jobs, and that he had approximately $65,000.00 in an IRA. Pl.Exh. # 123. Harrell informed Mansfield on February 15, 1991, that Mercantile would fulfill its contract if the Mansfields invested their entire $60,000.00 up front, and if they had income sufficient to qualify for the end loan. Pl.Exh. # 124. In the meantime, construction was stopped. By letter dated July 15, 1991, Mansfield listed the monies he and his wife had invested in the house. Pl.Ex. # 75. Included in the list of materials Mansfield claims to have purchased for the home are windows purchased from Southwest Sash and Door. However, that bill, in the amount of $11,085.74, was paid by Broadview, not the Mansfields. Pl.Exh. # 76. By July 15, 1991, Mercantile was satisfied that the Mansfields

had met both conditions, and construction resumed.

Thereafter, there were some cost overruns. Mercantile refused to exceed the $180,000.00 debt limit. Pl.Exh. # 133. On January 21, 1992, in order to complete the home, Mansfield deposited into the construction account a cashiers check issued on November 25, 1991, made payable to "Broadview Lumber" in the amount of $19,303.37. He endorsed the check as follows: "Broadview Lumber Co., Inc. Richard T. Mansfield President." Pl.Exh. # 77. He then presented the check, along with a deposit slip for the construction account, to a teller who accepted the deposit. Mercantile credited the construction account with said deposit. Those funds were then used to pay for construction costs. The Mansfields closed on the home on April 6, 1992, and issued a Deed of Trust to Mercantile securing a $180,000.00 interest in the home. Pl.Exh. # 22.

### A. The Conversion Count Against Mansfield as to the $19,303.37 Cashier's Check

█ In Count I of the Complaint the trustee seeks the sum of $19,303.37 from Richard and Jenny Mansfield for the conversion of a check made payable to debtor for that amount. It is undisputed that Mansfield deposited a cashier's check made payable to the debtor into his construction account at Mercantile. The funds from said account were used for Mansfield's personal benefit. Therefore, I find in favor of the trustee and against Richard Mansfield as to the $19,303.37 included in Count I. I previously found in favor of Jenny Mansfield as to conversion. *Supra*, Section II. A.(1).

### B. The Conversion Counts as to SMB and Mercantile

In Counts II and VIII, the trustee seeks to recover damages from SMB for pre-petition and unauthorized post-petition transfers of property of the estate, and conversion of property of the estate. In Counts III and IX, the Trustee seeks to recover damages of $19,303.37 from Mercantile due to the unauthorized post-petition transfer of property of

the estate and conversion of property of the estate.

The trustee's cause of action against the banks for conversion is based upon the theories that SMB and Mercantile violated the Uniform Fiduciaries Act ("UFA") and are not holders-in-due-course pursuant to the Uniform Commercial Code ("UCC"). The issue here boils down to whether the banks either had actual knowledge that Mansfield was violating his fiduciary duty or knew of such facts that the failure to inquire further constitutes bad faith.[13]

Two Missouri cases interpret the bad faith element of the UFA. In *Southern Agency Co. v. Hampton Bank of St. Louis*, 452 S.W.2d 100 (Mo.1970), a fiduciary owned one-third of one insurance agency and all of a second agency. A bank allowed the fiduciary to use funds of the first agency to purchase two cashier's checks payable to a creditor of the second agency. The bank further allowed the fiduciary to deposit a check pay-able to the first agency into the account of the second one. The bank also allowed the fiduciary to use funds of the first agency to purchase a cashier's check payable to himself. The fiduciary had authority to endorse checks payable to the first agency, and to sign checks for such agency. The bank did not benefit in any way from these transactions. The Court first found that the bank did not have actual knowledge of the bank's fraud. Turning to bad faith, the court said that the question is whether "the bank had knowledge of such obvious facts that to remain silent would permit the fraud to continue and so failure to inquire amounted to bad faith." 452 S.W.2d at 106. The court found that the transactions were not unusual or open to question or suspicion and, therefore, held that the bank was under no obligation to inquire as to whether the fiduciary was breaching any duty owed his principal. *Id.* at 106.

In *Trenton Trust Co. v. Western Surety Co.*, 599 S.W.2d 481 (Mo.1980), two minor

**13.** The section of the UFA applicable to the Mercantile transaction is Section 456.310 which provides as follows:

> If a fiduciary makes a deposit in a bank to his personal credit of checks drawn by him upon an account in his own name as fiduciary, or of checks payable to him as fiduciary, or of checks drawn by him upon an account in the name of his principal if he is empowered to draw checks thereon, or *of checks payable to his principal and endorsed by him, if he is empowered to endorse such checks, or if he otherwise makes a deposit of funds held by him as fiduciary*, the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary; and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal, unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making such deposit or in drawing such check, or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith (emphasis added).

Mo.Stat.Ann. § 456.310 (1992). That provision is not applicable to SMB, however, since the SMB transactions did not involve deposits to a bank account. Instead, SMB issued cashier's checks for funds or cashier's checks made payable to debtor, deposited funds to the Mansfields' account, or gave Mansfield cash. The applicable section of the UFA for those transactions is Section 456.260, which provides as follows:

> If any negotiable instrument payable or endorsed to a fiduciary as such is endorsed by the fiduciary, or *if any negotiable instrument payable or endorsed to his principal is endorsed by a fiduciary empowered to endorse such instrument on behalf of his principal*, the endorsee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in endorsing or delivering the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that his action in taking the instrument amounts to bad faith. *If, however, such instrument is transferred by the fiduciary in payment of or as security for a personal debt of the fiduciary to the actual knowledge of the creditor, or is transferred in any transaction known by the transferee to be for the personal benefit of the fiduciary, the creditor or other transferee is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in transferring the instrument* (emphasis added).

Mo.Stat.Ann. § 456.260 (1992).

I note also that both banks defend in part on the basis that they were holders in due course. Section 400.3–302, R.S.Mo. defines a holder in due course, in relevant part, as one who takes an instrument for value, in good faith, and without knowledge of competing claims to it. *Trenton Trust Co. v. Western Surety Co.*, 599 S.W.2d 481, 496 (Mo.1980). Thus, the good or bad faith of the banks is determinative here as well.

children were the beneficiaries under their deceased father's insurance policy. The insurance company sent two checks for $12,-000.00 each to Nancy Hooks, the children's mother, as guardian of the minor children's estate. Hooks discussed the insurance proceeds with an officer of Trenton Trust Company, who advised her to purchase certificates of deposit with the funds. Each insurance check was made payable on its face to Hooks as guardian of the estate of a minor child, and was endorsed accordingly at the bank officer's direction. However, the two certificates of deposit issued in exchange for these checks did not reflect the fiduciary character of the funds. Later, Hooks pledged the certificates of deposit as collateral for personal loans from Trenton Trust Company. The Missouri Supreme Court held that Hooks breached her fiduciary duty to her wards when she pledged the certificates of deposit, and that Trenton Trust's agent had knowledge the certificates of deposit held by Hooks were purchased with funds held in her capacity as guardian. As such, Trenton Trust was required to return the certificates of deposit to the newly-appointed guardian. *Id.* at 483–86. Although not necessary to its decision, the Court went on to construe the bad faith provision, noting that while mere negligence does not amount to bad faith, it is not necessary to show dishonesty or evil motive. Instead, the issue is "whether it is commercially unjustifiable for the person accepting a negotiable instrument to disregard and refuse to learn facts readily available. Where circumstances suggestive of the fiduciary's breach become sufficiently obvious it is 'bad faith' to remain passive." *Id.* at 492.

### 1. *The Conversion Claim Against Mercantile*

I turn now to the Trustee's conversion claim against Mercantile. Certainly, the Mercantile teller was negligent in allowing Mansfield to deposit into his and his wife's account a check made payable to Broadview. And, the Vice President of the bank was aware at the time that Broadview was closed. However, these facts alone do not add up to

knowledge, on the part of Mercantile, that Mansfield was breaching his fiduciary duty. Nor should those facts have been sufficient to put Mercantile on notice that such a breach might be taking place.

The trustee contends that Mercantile has the burden of establishing that it did not have actual knowledge of Richard Mansfield's breach of fiduciary duty and that it acted in good faith. The trustee cites *Anchor Centre Partners, Ltd. v. Mercantile Bank*, 803 S.W.2d 23 (Mo. banc 1991), for this allocation of the burden of proof. That case, however, stands for the opposite conclusion. The party who asserts the affirmative of an issue has the burden of proving that issue. *Id.* at 30 (citations omitted). The trustee asserts that Mercantile had actual knowledge of Mansfield's breach and acted in bad faith, thus the trustee at all times had the burden of proof as to that issue. Since he has not met that burden, I find that the Trustee cannot recover against Mercantile for conversion.

### 2. *The Conversion Claim Against SMB*

By contrast, SMB's exposure is based on much more than one mistake by one teller. Indeed, the cooperation of SMB, even if unintentional, made it possible for Mansfield to convert funds of the debtor and to shelter those funds from Broadview's creditors. The following factors support the conclusion that SMB had actual knowledge of Mansfield's fiduciary violations, and acted in bad faith.

Gary Denny, the president of SMB, testified that Mansfield notified him almost immediately that debtor had lost its line of credit with CIT. Denny reported to SMB's Board of Directors on January 25, 1991, that "Mansfield confirmed to the Bank the company had closed." Pl.Exh. # 210. Gary Hoskins, the vice-president of SMB in charge of SBA loans, sent a letter to the Small Business Administration, dated January 14, 1991, stating debtor had closed its doors on January 7, 1991, "and at this point and time we can assume they will not reopen".[14] Pl.Exh.

---

14. Mr. Hoskins testified that in that letter he was

simply advising the SBA that the one location

# 182. Gary Denny and Gary Hoskins also testified that it was common knowledge in the bank and in the community by the fall of 1991 that Broadview had ceased doing business. Indeed, on October 9, 1991, Mr. Hoskins sent another letter to the SBA advising them that the real estate loan was being turned over to SBA for liquidation. In that letter Hoskins stated that he had spoken with Mr. Mansfield at least monthly since January, that a 16.6% settlement had been offered to unsecured creditors, and that one creditor which rejected the settlement had obtained a judgment of approximately $80,000.00 on September 26, 1991. Pl.Exh. # 183.

After the judgment against Broadview was entered on September 26, 1991, Mr. Mansfield began conducting the company's banking business in a fashion which can kindly be described as unusual. Rather than depositing checks received from third parties into debtor's corporate account at SMB, he converted them to cashier's checks made payable to debtor. The total amount of funds involved in the maneuvering was $96,550.10.[15] This practice alone should have raised red flags in the bank. Mansfield kept the cashier's checks in his possession until such time as he presented them to SMB and exchanged them for other checks payable to himself and others or for cash. As a result, Mansfield himself took $66,242.73, and a total of $14,825.37 was paid to preferred unsecured creditors, against whom the trustee has had to bring actions to recover the amounts so paid. The remaining $15,482.00 is unaccounted for and cannot be traced.

The "splitting" of corporate checks is a disfavored banking practice. According to Scott Rosenthal, the Vice President of Operations of SMB, the bank in 1991 had no written procedures regarding the acceptance of corporate checks. According to Gary

Denny, the President, however, the bank's oral policy at that time required that checks payable to a corporation be deposited *in toto* in that corporation's checking account at the bank. Mr. Denny acknowledged that policy was not followed as to customers who bank employees knew well. As to those customers, if they controlled two different corporate accounts, Mr. Denny testified they might be allowed to split a deposit between such accounts.

■ A corporation should be required to deposit all funds into its corporate account to provide a paper trail to account for the company's money. *See, Empire Bank v. Fidelity & Deposit Co. of Maryland,* 828 F.Supp. 675, 678 (W.D.Mo.1993), *aff'd,* 27 F.3d 333 (8th Cir.1994) (a bank cannot recover from a bonding company for losses suffered in failing to follow its own policies in the cashing of corporate checks). Broadview has creditors and stockholders, other than Mansfield, who have a right to know how Broadview's money was distributed. When a bank allows a fiduciary to shuffle money while avoiding the corporate account, the paper trail disappears. Here, SMB is unable to determine whether it in fact gave cash to Mansfield on several occasions in which he presented to SMB cashier's checks made payable to Broadview. By requiring deposits into a corporate account a bank insures that it does not participate, even unwittingly, in a diversion of funds by a fiduciary. Indeed, SMB had an Excess Fidelity Bond with The Kansas Bankers Surety Company in 1990, 1991, and 1992. Pl.Exh. ## 203, 204, 205. In filling out the annual application and renewal form each of those three years, Denny certified that "tellers are absolutely prohibited from cashing or splitting the deposit of checks payable to a corporation" and "tellers are absolutely prohibited from accepting a check payable to a

---

was closed, not that the entire business had closed. Of course, Broadview had only one location, and Mr. Hoskins knew that.

**15.** This sum represents the total of seven transactions whereby Mansfield presented SMB with checks made payable to debtor in exchange for cashier's checks which began the chain of transactions in footnote 10. The dates and amounts are as follows:

| | |
|---|---|
| September 24, 1991 | $ 6,210.83 |
| October 2, 1991 | 15,800.71 |
| October 3, 1991 | 31,235.19 |
| October 16, 1991 | 10,000.00 |
| October 16, 1991 | 10,000.00 |
| October 23, 1991 | 4,000.00 |
| November 25, 1991 | 19,303.37 |
| Total | $96,550.10 |

corporation except for deposit into the corporate account." *Id.* In allowing favored customers to violate those practices SMB risks becoming a participant in a diversion of funds by a corporate fiduciary.

SMB claims that its actions were protected by a corporate resolution in its files which authorized Mansfield to conduct all business of Debtor. Broadview opened its corporate checking account numbered 010–020–907–8 (the "corporate account") at SMB on August 13, 1984. Def.Exh. # D. A corporate resolution, signed March 28, 1984, had been on file with the bank since August 13, 1984. *Id.*[16] The corporate resolution provided that SMB was authorized to make payments from the funds on deposit with it at the direction of Richard Mansfield, among others. Pl.Exh. # 105. But the funds at issue in this conversion claim were never deposited into the corporate account. In fact, Mansfield testified that he intentionally conducted all of debtor's business, after early October, 1991, in cashier's checks so as to shield such funds from debtor's creditors. Therefore, SMB is not protected by such corporate resolution.

SMB also contends that the last quoted paragraph of the resolution somehow protects it. But that paragraph only applies to loan transactions.

Next, SMB claims that, even if bank officials knew about debtor's problems, and about at least one outstanding judgment, the tellers at the bank who conducted the transactions were not aware Mansfield was breaching his fiduciary duty. Under this view, SMB would have no responsibility unless Mansfield conducted his business at the bank while wearing a large sign around his neck proclaiming, "I am breaching my fidu-

ciary duty to Broadview Lumber Co., Inc." The UFA, however, requires banks to learn facts which are readily available.

The Missouri Supreme Court in *Trenton Trust* speculates that a bank's actual knowledge that a fiduciary is depositing corporate funds into his personal account constitutes actual knowledge that the fiduciary is committing a breach of his fiduciary duties. *Trenton Trust,* 599 S.W.2d at 489 n. 2. *See also, Cassel v. Mercantile Trust Co.,* 393 S.W.2d 433, 438 (Mo.1965); *Brede Decorating, Inc. v. Jefferson Bank and Trust Co.,* 345 S.W.2d 156, 161–62, 164 (Mo.1961).[17] While the Court did not reach the issue, it did state that "such practice should be curtailed." *Id.* I agree. I find that SMB had actual knowledge that Mansfield's behavior was a breach of his fiduciary duty.

As stated, either actual knowledge or bad faith is sufficient under the UFA. SMB next contends that at most its actions were negligent, and not in bad faith. The mere failure to make inquiry when there are suspicious circumstances is negligent. *Trenton Trust,* at 492 (citations omitted). However, if the bank has knowledge of sufficiently obvious facts which indicate a fiduciary is breaching his duty, cashing the checks or making the deposits amounts to bad faith. *Southern Agency Co. v. Hampton Bank of St. Louis,* 452 S.W.2d 100, 104 (Mo.1970). SMB took checks made payable to debtor and rather than depositing those checks into debtor's corporate account, allowed Mansfield to deposit the funds into his own accounts or receive cash. None of these activities was protected by the corporate resolution, which only covered deposited funds. All of the activities were expressly forbidden

---

**16.** The corporate resolution provides that:
 Southwest Missouri Bank, Carthage, Missouri be, and is hereby designated a *depository* of the funds of [Broadview Lumber Company, Inc.], and
 Said bank be and hereby is authorized to make payment from the funds of the corporation *on deposit with it,* upon and according to the check and/or check voucher of this corporation signed by either, Richard T. Mansfield ... and

 Richard T. Mansfield is hereby authorized to execute promissory notes on behalf of the cor-

poration to borrow money upon its obligations and to assign, sell, or deliver as collateral for loans, assets of the corporation such as notes, bills receivable, warehouse receipts, bonds, stocks, or other securities.
 Pl.Exh. # 105 (emphasis added).

**17.** Note that the causes of action in both of the preceding cases arose before Missouri adopted the UFA.

under SMB's surety agreement. At the very least, the president, the board of directors, and a vice-president of the bank knew debtor was out of business, and had been out of business for nine months. And, at least one officer knew that a settlement had been rejected by one creditor, and that there was an outstanding judgment. Mansfield would have been unable to convert funds of Broadview to his own use without the participation of SMB. Therefore, I find that SMB acted in bad faith.

 SMB claims it is not liable in conversion for failure to inquire unless the trustee can demonstrate that the bank benefitted financially from the transactions. *Id.* at 105; *Trenton Trust,* at 493 (citations omitted). The trustee maintains that SMB benefitted by having Mansfield remain a satisfied customer of the bank. Further, Mansfield's personal loan with SMB was secured by Broadview stock. Pl.Exh. # 102. That loan for $65,000.00 became unsecured at the time debtor ceased doing business on January 7, 1991. The Mansfields have continued to reduce the indebtedness on said loan, which had a balance of $47,517.30 on February 15, 1993. Pl.Exh. # 104. SMB has benefitted from any payments made on that debt. All payments on the unsecured loan were made by SMB debiting the Mansfield's account no. 5082, which received deposits of debtor's funds totalling $21,612.41. Additionally, the Mansfields granted SMB a Deed of Trust on the real estate located at 1505 Grand Avenue as consideration for a loan extension of the unsecured debt granted by SMB on February 15, 1993.

 For all of the above reasons, I find that SMB had actual knowledge of the fact that Mansfield breached his fiduciary duty to debtor, that SMB acted in bad faith when it cashed checks made payable to debtor and deposited funds into the Mansfields' accounts or gave Mansfield cash in return,[18] and that SMB benefitted from Mansfield's breach of his fiduciary duty. Therefore, I find that SMB is liable to the trustee for the conversion of $46,939.36 under section 456.260 and 456.310 of the UFA. Judgment is entered in favor of the trustee on Count II of the Complaint in the sum of $46,939.36.

## C. The Conversion Claim Against Mansfield as to the Windows Used in Construction

 Included in the list of materials Mansfield told Mercantile he purchased for the Grand Avenue House are windows purchased from Southwest Sash and Door in the amount of $11,789.68. Pl.Exh. # 75. A check for $11,085.74 drawn on the corporate checking account of debtor on June 6, 1991, is made payable to Southwest Sash and Door. Pl.Exh. # 76. The trustee seeks the return of the funds expended for purchase of such windows[19]. The trustee's claim that the windows were purchased for inclusion in Mansfield's home was not contested. Mansfield's only defense to this claim was that he had not drawn his entire salary for several months in 1990, and thus he was entitled to have debtor purchase the windows. The Trustee also seeks to recover $8,739.63 for the roof and $10,369.68 for lumber, both of which Mansfield told Mercantile had been paid for by him and his wife. Pl.Exh. # 75. None of these materials, however, were purchased with checks that could be traced to debtor's corporate checking account.[20]

18. The trustee prayed for the funds distributed to debtor's unsecured creditors after September 24, 1991, in the sum of $14,825.37 as part of his conversion cause of action against Mansfield and SMB. However, I find that as to those funds, Mansfield did have apparent authority to pay debts of debtor. In so far as those payments constituted preferential transfers, the trustee has a cause of action against the creditors, but not against Mansfield or SMB.

19. The trustee did not specifically plead conversion with respect to these funds. However, the evidence was admitted without objection from any defendant.

20. I note that the trustee indicated that debtor was never reimbursed for the expenditure for lumber, however, the trustee never presented sufficient evidence to trace either the lumber or the sums expended for lumber into the Grand Avenue House. I further note that Mansfield claimed that he had elected to draw less than a full salary for the months of May, June, July, August, September of 1990, thus paying for any expenditure debtor may have made toward the Grand Avenue House. Def.Exh. # 1. Mansfield states that Broadview owed him $12,000.00 in back salary, and he owed debtor $9,479.14 for lumber and $11,085.74 for windows. Mansfield also offered insufficient evidence to trace any

As to the $11,085.74, payable to Southwest Sash and Door, I find that debtor's funds were converted to Mansfield's use when he authorized a check to be drawn on debtor's corporate account to pay for windows to be used in his personal residence. Therefore, I find in favor of the trustee for conversion in the sum of $11,085.74. I previously found in favor of Jenny Mansfield as to conversion. *Supra,* Section II.A.(1).

## IV. TRUSTEE v. RICHARD AND JENNY MANSFIELD, MERCANTILE AND SMB PRE–PETITION AND UNAUTHORIZED POST–PETITION TRANSFERS

The trustee seeks alternative relief from Richard and Jenny Mansfield, Mercantile and SMB for preferential pre-petition and unauthorized post-petition transfers.

### A. Pre-petition Transfers to Richard Mansfield

■■■ Count V of the Complaint seeks to avoid alleged pre-petition preferential transfers to Richard Mansfield. The Bankruptcy Code provides that the trustee may avoid any transfer of debtor's property made to a creditor in satisfaction of an antecedent debt within ninety days of the petition. 11 U.S.C. § 547(b). The involuntary bankruptcy petition was filed on November 12, 1991. Mansfield, with the assistance of SMB, transferred $4,691.33 into either cash or his personal checking accounts between October 9, 1991, and November 7, 1991.[21] I have previously found that Mansfield was not a creditor of

debtor at this time, therefore, as a partial alternative to the relief granted the trustee in Count I of the Complaint, the trustee may avoid the transfer of $4,691.33 of debtors' funds to Richard Mansfield.

### B. Post–Petition Transfers to Richard Mansfield

■■■ In Count X of the Complaint the trustee prays for judgment against Richard Mansfield for preferential post-petition transfers. An involuntary bankruptcy petition was filed against debtor on November 12, 1991. After that date, $61,551.40 was transferred to Mansfield without authorization of this Court.[22] As with the other transfers in this case, Richard Mansfield claims the post-petition transfers were reimbursement for services provided to debtor. Section 549 of the Code provides that the trustee may avoid post-petition transfers if: (1) a transfer occurs; (2) the transfer was of property of the estate; (3) the transfer occurred after the case commenced; and (4) the transfer was without Court authorization.[23] *Auxano, Inc. v. Harris (In re Auxano),* 96 B.R. 957, 960 (Bankr.W.D.Mo.1989). There is an exception to the requirement of a Court order for post-petition transfers in an involuntary bankruptcy case to the extent value is given after the commencement of the case and before an order for relief is entered.[24] The value can be for services, but not in satisfaction of a pre-petition debt. 4 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 549.03[2] at 549–11 (15th ed. 1993). Also, in an involuntary bankruptcy, section 303(f) provides that until an order for relief is entered, "any business

---

salary to which he was entitled into materials for the Grand Avenue House.

21. See note 10 and accompanying text.

22. I note that payments for $14,825.37 were preferential transfers to creditors who are not parties to this proceeding, and are not recoverable from Mansfield.

23. Section 549(a) provides that:
(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—
(1) [made] that occurs after the commencement of the case; and
(2) (A) that is authorized only under section 303(f) or 542(c) of this title; or

(B) that is not authorized under this title or by the court.
11 U.S.C. § 549(a).

24. Section 549(b) provides:
(b) In an involuntary case, a transfer made after the commencement of such case but before the order for relief to the extent any value, including services, but not including satisfaction or securing of a debt that arose before the commencement of the case, is given after the commencement of the case in exchange for such transfer, notwithstanding any notice or knowledge of the case that the transferee has.
11 U.S.C. § 549(b).

of the debtor may continue to operate, and the debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced." 11 U.S.C. § 303(f). These two sections taken together indicate that a post-petition transfer is not preferential to the extent that the transfer is in exchange for services necessary to continue the operation of the debtor; that provide value to the debtor or the estate; or that are pursuant to a Court order. *Hallet v. Commerce Bank of Barry County (In re Billick)*, 67 B.R. 670, 673 (Bankr.W.D.Mo.1986). The trustee argues that this Court did not authorize these transfers. Further, debtor had ceased operations on January 7, 1991, so Mansfield was not operating the business of the debtor pursuant to either section 303(f) or section 549(b). Mansfield claims he performed valuable services for Broadview in attempting to sell the real estate of the debtor up until the foreclosure sale on January 13, 1992. He further cites the fact the telephone was operational as of February 11, 1992, as proof that debtor was still in business. Def.Exh. # 5. But Mansfield personally guaranteed the SBA loan on debtor's real estate. To the extent that he attempted to maximize the sales price for that real estate, it was to prevent a deficiency for which he would be liable, not to benefit the estate. Further, while I previously found that Mr. Mansfield performed valuable services for the period from January 2 through May 9, 1991, he was compensated for those services. By May 9, 1991, he was no longer working full time for the debtor, since he had started a new business. The $25,000.00 retained by him as salary for May 9 through October 2, 1991, though not paid in the ordinary course of business, is more than adequate for the services he performed in that period. After October 2, any services he may have performed for debtor were of minimal value, and he is not entitled to any compensation. I, therefore, find that the transfers of a total of $61,551.40 from November 18, 1991, through March 6, 1992, were post-petition transfers which may be avoided by the trustee pursuant to section 549(b). I further find that the transfers at issue were for the benefit of Richard Mansfield, and are recoverable under Section 550.[25] As to the sum of $61,-551.40, I find in favor of the trustee in Count X. These are included in the funds represented by the conversion judgment in Count I.

### C. Pre and Post–Petition Transfers to Jenny Mansfield

The trustee seeks to recover from Jenny Mansfield, pre and post-petition transfers made by Broadview to Richard Mansfield, pursuant to Section 550(b) of the Code.[26] I have already found that Richard Mansfield deposited funds belonging to debtor into his and Jenny Mansfield's joint checking accounts at SMB and Mercantile. The Bankruptcy Code gives the trustee the right to avoid a transfer to an immediate or mediate transferee, 11 U.S.C. § 550(a)(2), unless the transferee takes for value, in good faith, and without knowledge of the voidability of the transfer. 11 U.S.C. § 550(b)(1). It is undisputed that Jenny Mansfield wrote checks on account No. 5082 and the construction account. Pl.Exh. ## 5–18B and 23–45. Further, it is assumed that when a husband deposits funds into a joint checking account he is making a gift to his wife, subject only to his own rights of withdrawal. *Noonan v. Rauh (In re Rauh)*, 164 B.R. 419, 423

---

**25.** Section 550 provides in relevant part as follows:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 549 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

. . . . .

11 U.S.C. § 550.

**26.** *Id.*

(Bankr.D.Mass.1994). *See also,* Mo.Rev.Stat. 362.470 (Supp.1994) (a deposit made into a joint account becomes the property of all persons named on the account as joint tenants). Jenny Mansfield failed to show that she gave value for the funds deposited into the joint check accounts. Absent proof of value, I will find the deposits were a gift to Jenny Mansfield, that she is a mediate transferee, and the transfers are, thus, subject to avoidance. Therefore, judgment should be entered in favor of the trustee and against Jenny Mansfield for $61,069.43 in Count X, and $3,291.33 in Count V.[27]

### D. Transfers to Southwest Missouri Bank and Mercantile Bank

 SMB issued cashier's checks at the direction of Richard Mansfield. The trustee claims that when Mansfield caused the cashier's checks to be deposited into his personal checking accounts at SMB and Mercantile, the banks became transferee of debtor's property subject to the trustee's avoiding power. A transfer means "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption." 11 U.S.C. § 101(58)[54]. In order to find the banks were transferee, I must find that the banks acquired property of debtor or an interest in property of debtor following the transfer. *Id.* I do not so find.

 Cashier's checks are negotiable instruments which are the same as cash. *Ross v. United States (In re Auto–Pak, Inc.),* 63 B.R. 321, 322 (Bankr.D.D.C.1986) *rev'd on other grounds,* 73 B.R. 55 (D.D.C.1987). They are utilized as a means of transferring the purchaser's cash to the check's payee. *Id.* The issuing bank is not a transferee, it is simply a conduit. *Id.* The person or entity to whom a cashier's check is made payable is the initial transferee. *Still v. American Nat'l Bank & Trust Co. of Chattanooga (In re Jorges Carpet Mills, Inc.),* 50 B.R. 84, 85 (Bankr.E.D.Tenn.1985). Alternatively, in *Robinson v. Home Savings of America (In re Concord Senior Housing Foundation),* the court held that when an agent of a debtor misappropriates funds of the debtor, the agent becomes the initial transferee of the funds. 94 B.R. 180, 183 (Bankr.C.D.Ca. 1988). Therefore, Mansfield became the initial transferee of debtor's funds when he caused SMB to issue cashier's checks made payable to himself or to Broadview which he ultimately misappropriated. "An initial transferee is one who receives money from a person or entity later in bankruptcy, and has dominion over the funds." *First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Financial Serv., Inc.),* 974 F.2d 712, 722 (6th Cir.1992). An entity has dominion over the funds when it has the right to put the money to its own use. *Id.* While Mansfield had dominion and control over debtor's funds, no evidence was presented that either SMB or Mercantile exercised any dominion over the funds that were deposited into Mansfield's checking accounts. Nor did the banks have the right to put the money in Mansfield's accounts to their own use. *See, e.g. Security First Nat'l Bank v. Brunson (In re Coutee),* 984 F.2d 138, 141 (5th Cir.1993) (holding that a party who receives a transfer directly from the debtor will not be considered the initial transferee unless that party gains dominion and control over the funds); *Richardson v. Federal Deposit Insurance Corp. (In re Blackburn Mitchell Inc.),* 164 B.R. 117, 124 (Bankr.N.C.Ca.1994) (holding that a bank which receives debtor's funds and issues a cashier's check in exchange is a financial intermediary unless the bank receives funds for its own account). Therefore, I find that the banks were conduits and not initial transferee of debtor's funds.

 A mediate or immediate transferee is simply one who takes in a later transfer down the chain of title or possession for value, in good faith, and without knowledge of the voidability of the transfer. *In re Baker & Getty Financial Serv. Inc.,* 974 F.2d

---

**27.** I note that $1,881.97 was transferred to Richard Mansfield as cash proceeds. Of that sum of $1,881.97, $1,400.00 was transferred pre-petition and $481.97 was transferred post-petition. The trustee has not proven Jenny Mansfield was a transferee of the cash proceeds. Therefore, the judgment against Jenny Mansfield has been reduced by those amounts.

at 722; 11 U.S.C. § 550(b)(1). SMB never took in any of debtor's funds such that it could use or control the property. The funds were deposited into checking accounts controlled by Mansfield. Likewise, Mercantile served as a conduit of debtor's funds into the construction account which was controlled by Mansfield. Therefore, I find that SMB and Mercantile were not immediate or mediate transferee of debtors property. As such, I find in favor of SMB as to Count VIII of the Complaint, and I find in favor of Mercantile as to Count IX of the Complaint.

## V. THE CONSTRUCTIVE TRUST AND EQUITABLE LIEN CLAIMS

In Count IV the trustee seeks a constructive trust or, in the alternative, an equitable lien against the Mansfields' real estate located at 1505 Grand Avenue, Carthage, Missouri. He claims that some of the funds used in construction of such home belonged to the debtor, and were improperly converted by the Mansfields to their own use.

■■■ A constructive trust or equitable lien is available only when there is no adequate remedy at law. 51 Am.Jur.2d § 24 at 163; *Wilkinson v. Tarwater*, 393 S.W.2d 538, 542 (Mo.1965); *Superior Press Brick Co. v. City of St. Louis*, 155 S.W.2d 290, 295 (Mo.Ct.App. 1941). *See also Linder v. Hawkeye–Security Ins. Co.*, 472 S.W.2d 412, 414 (Mo.1971), *cert. denied, Haynes v. Linder*, 405 U.S. 950, 92 S.Ct. 1176, 31 L.Ed.2d 227 (1972); *City of St. Louis v. Golden Gate Corp.*, 421 S.W.2d 4, 7 (Mo.1967); *Tuckwiller v. Tuckwiller*, 413 S.W.2d 274 (Mo.1967); *Godwin v. Graham*, 360 Mo. 418, 228 S.W.2d 789, 795 (1950); *Shockley v. Harry Sander Realty Co.*, 771 S.W.2d 922, 924 (Mo.Ct.App.1989); *Farmer's New World Life Ins. Co., Inc. v. Jolley*, 747 S.W.2d 704, 705 (Mo.Ct.App.1988); *Stanovsky v. Group Enterprise & Constr. Co., Inc.*, 714 S.W.2d 836, 838 (Mo.Ct.App.1986); *Kearney Commercial Bank v. Deiter*, 407 S.W.2d 575, 581–82 (Mo.Ct.App.1966); *Boeving v. Vandover*, 218 S.W.2d 175, 177 (Mo.Ct.App.

1949); *Latshaw v. Simpson*, 162 S.W.2d 635, 637 (Mo.Ct.App.1942).

■■■ Here, the trustee has an adequate remedy at law. Unlike *Chiu v. Wong, (In re Wong)*, 16 F.3d 306, 307 (8th Cir.1994), where converted funds were invested in the homestead of the debtor, shielding it from the trustee, the trustee has a judgment against Jenny Mansfield in the sum of $3,291.31 in Count V and $61,069.43 in Count X. Such judgment against Jenny Mansfield exceeds the amount of debtor's property the trustee was able to trace into the Grand Avenue Home.[28] The trustee argues that his judgment against the Mansfields will not have first priority over the mortgages on such real estate, thus rendering the legal judgment inadequate. In order for a remedy at law to be adequate "it must be clear, complete, and as practical and efficient to the ends of justice and its proper administration as a remedy in equity." *Huffman v. Brigance*, 128 S.W.2d 639, 645 (Mo.Ct.App.1939). However, in order to prove a legal remedy is inadequate the trustee must demonstrate that an award of damages would be speculative and difficult to measure. *Official Committee of Unsecured Creditors v. PSS Steamship Company (In re Prudential Lines, Inc.)*, 114 B.R. 27, 31 n. 3 (Bankr.S.D.N.Y. 1989), *aff'd*, 119 B.R. 430 (S.D.N.Y.1989), *citing* Wright and Miller, 11 Federal Practice and Procedure § 2944 (Supp.1983). In this case, the award of damages is not only liquidated, it exceeds the amount which could be awarded by an equitable lien. Another exception in Missouri to the rule that one cannot maintain an action in equity if an adequate remedy at law is available is where a creditor proves the other party insolvent. *Farmers & Traders Bank v. Kendrick*, 108 S.W.2d 62, 64 (Mo.1937). *Huffman v. Brigance*, 128 S.W.2d 639, 645 (Mo.Ct.App.1939). The trustee did not prove the insolvency of the Mansfields, so that exception does not apply in this case. Therefore, in light of the fact that the trustee has an adequate legal remedy against both Jenny and Richard

---

**28.** I note that the trustee successfully traced the sum of $19,303.37 into the construction account at Mercantile. He also traced $11,085.74 into the home through a check drawn on debtor's corporate account on June 6, 1991, made payable to Southwest Sash and Door in the sum of $11,085.74.

Mansfield, I find in favor of the Mansfields as to Count IV of the Complaint.

## VI. PREJUDGMENT INTEREST

The trustee seeks prejudgment interest. The decision to award prejudgment interest lies within the discretion of the Court. *Equal Employment Opportunity Commission v. Rath Packing Co.*, 787 F.2d 318, 333 (8th Cir.1986), *cert. denied, Rath Packing Co. Creditors' Trust v. E.E.O.C.*, 479 U.S. 910, 107 S.Ct. 307, 93 L.Ed.2d 282 (1986); *Turner v. Davis, Gillenwater & Lynch (In re Investment Bankers, Inc.*, 4 F.3d 1556, 1566 (10th Cir.1993), *cert. denied, Davis, Gillenwater & Lynch v. Turner*, —— U.S. ——, 114 S.Ct. 1061, 172 L.Ed.2d 381 (1994). Missouri law provides that "[t]he jury on the trial of any issue, or on any inquisition of damages, *may*, if they shall think fit, give damages, in the nature of interest, over and above the value of the goods at the time of the conversion or seizure." Mo.Stat.Ann. § 537.520 (1988) (emphasis added). Two legitimate purposes are served by an award of prejudgment interest: (1) it compensates plaintiffs for the true costs of the money damages suffered; (2) where liability and damages are fairly certain, it promotes settlement and prevents undeserved benefit from needless delay. *Rath* at 333. However, if the Court determines that the plaintiff's interest in make-whole relief is outweighed by the impact of a prejudgment interest award on defendants, the Court may deny pre-judgment interest. *Id.* Further, under Missouri law, pre-judgment interest is ordinarily denied if the claim is not liquidated because a person cannot be expected to pay a claim when he does not know how much he owes. *United States v. Dimarco Corp.*, 985 F.2d 954, 959 (8th Cir.1993). Unlike a claim on a promissory note or for back-pay, the claim in this case was not liquidated and the amount of damages was not certain until judgment was rendered. The trustee cites *Independence Flying Service, Inc. v. Ailshire* for the general rule that in Missouri actions for conversion, plaintiffs may recover interest from the date of conversion. 409 S.W.2d 628, 632 (Mo.1966). Despite the discretionary language in the general rule, the Missouri Supreme Court held that it would be an abuse of discretion not to allow prejudgment interest for conversion. However, the Court only allowed interest from the date of demand because to allow interest from the date of conversion would yield an inequitable result. *Id.* Unlike postjudgment interest, no statute governs prejudgment interest in federal cases. *See* 28 U.S.C. § 1961. Prejudgment interest is presumptively available in suits under federal law for liquidated claims. *Partington v. Broyhill Furniture Industries, Inc.*, 999 F.2d 269, 274 (7th Cir.1993). In the absence of a statutory provision, pre-judgment interest may be awarded to compensate the injured party, unless to do so would be inequitable. *Investment Bankers* at 1566. The court in *Investment Bankers* held that:

> In bankruptcy proceedings, the courts have traditionally awarded prejudgment interest to a trustee who successfully avoids a preferential or fraudulent transfer from the time demand is made or an adversary proceeding is instituted unless the amount of the contested payment was undetermined prior to the bankruptcy court's judgment.

*Id.* Unlike the case at hand, there was no dispute as to the amount of the contested payment in *Investment Bankers*, thus the Court found that an award of prejudgment interest would be consistent with the balance of equities. *Id.*

The liquidation of the trustee's claims against the defendants in this case required a ten Count Complaint against four different groups of defendants, with two cross-claims. The resolution of the issues raised in the Complaint encompassed a three-day trial and a lengthy Memorandum Opinion. Richard Mansfield at all times maintained that he was working for the debtor and all the money was compensation for his efforts. While I allowed Mansfield only approximately thirty percent of the funds he appropriated as compensation, I cannot find under the facts of this case that the claim against him or Southwest Missouri Bank was liquidated until judgment was entered. I, therefore, deny the trustee's request for prejudgment interest.

## VII. SMB v. RICHARD AND JENNY MANSFIELD

### and

## MERCANTILE v. RICHARD AND JENNY MANSFIELD

To the extent of their own liability, SMB and Mercantile filed cross-claims against the Mansfields.

### A. Mercantile Cross–Claim

I found in favor of Mercantile as to Counts III and IX of the Complaint, thereby mooting Counts II, III, IV, and V of Mercantile's cross-claim.

 In Count I of its cross-claim, Mercantile asks for the attorney's fees, costs, and expenses Mercantile incurred in defending this adversary proceeding. Mercantile claims that the Deed of Trust which secures its loan of $180,000.00 to Mansfield provides for attorney's fees, costs, and expenses in the event a legal proceeding threatens Mercantile's collateral. The Deed of Trust provides in relevant part:

**7. Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property ..., then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the property. Lenders actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorney's fees and entering on the Property to make repairs....

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

First Amended Cross–Claim of Mercantile Bank of Joplin, Exhibit A, ¶ 7. Mercantile argues that Count IV of the trustee's Complaint attempts to subordinate Mercantile's Deed of Trust. Indeed, that relief is being granted. As such, paragraph 7 of the Deed of Trust specifically authorizes Mercantile to recover attorney's fees and expenses in defense of its lien. Mansfield makes two points in his response. First, he claims that the American Rule applies in this Court. The American Rule provides that litigants pay their own attorneys unless there is an enforceable contractual provision or some other exception to the contrary. *Wonder Corporation of America v. Chase Manhattan Bank (In re Wonder Corporation of America),* 109 B.R. 18, 27 (Bankr.D.Conn.1989). Both Richard and Jenny Mansfield agreed at the time they negotiated the loan with Mercantile to be responsible for any attorney's fees Mercantile incurred in defending its collateral. Therefore, the exception to the American Rule applies in this case.

Second, Mansfield contends in effect that Mercantile incurred most of its attorney's fees defending its own negligence in allowing him to intentionally divert funds. However, the Deed of Trust grants Mercantile attorney's fees, without qualification, in any legal proceeding which threatens Mercantile's security interest. Pl.Exh. # 22. I find that Count IV of the Complaint filed in this case, which requested equitable subordination of Mercantile's security interest, threatened such security interest and entitles Mercantile to judgment in its favor on Count I of its cross-claim. Mercantile submitted a bill on April 11, 1994, indicating attorney's fees in the sum of $15,666.50 and expenses in the sum of $484.43 for a total of $16,150.93. No party to this action objected to the necessity or reasonableness of said fees. Judgment will be entered in favor of Mercantile against the Mansfields in the sum of $16,150.93. That sum will become an additional debt of the Mansfields to Mercantile as provided by paragraph 7 of the Deed of Trust.

### B. SMB Cross–Claim

SMB brings a cross-claim against Richard and Jenny Mansfield for indemnification,

contribution, breach of transfer warranties and for the imposition of a constructive trust.

 SMB seeks relief for indemnification in Count I and contribution in Count II of its cross-claim. Indemnity is a contract by which the liability for loss is shifted from one held legally responsible for an act to another. Black's Law Dictionary 692 (5th ed. 1979). In Missouri a party can make an indemnification claim only when there is an express or implied agreement to indemnify. *Coello v. Tug Mfg. Corp.*, 756 F.Supp. 1258, 1263 (W.D.Mo.1991). For express indemnification to apply, the written agreement must contain an explicit "intention to indemnify liabilities due to indemnitee's own negligence." *Id.* SMB does not claim that the Mansfields ever signed a written agreement to indemnify it, nor has SMB admitted to any wrongdoing. Therefore, SMB does not have a claim for express indemnity.

 Implied contractual indemnity "presupposes actionable negligence of both parties toward a third party," *Campbell Sixty–Six Express, Inc. v. Empire Bank (In re Campbell Sixty–Six Express, Inc.)*, 94 B.R. 1014, 1017 (Bankr.W.D.Mo.1988). Despite a common-law doctrine which long held that there could be no contribution or indemnification among joint tortfeasors, non-contractual indemnity is allowed in Missouri under principles of fairness as an "extra form of contribution." *Missouri Pacific Railroad Co. v. Whitehead & Kales Co.*, 566 S.W.2d 466, 469 (Mo. banc 1978). The courts recognize that while two tortfeasors "may be jointly liable each in full to an injured plaintiff, as between them there may be a considerable difference in blame." *Id.* at 469–70. I find that non-contractual indemnity is appropriate here. While I find SMB is liable under the UFA for its failure to inquire about Richard Mansfield's misappropriation of debtor's funds, the fact remains that Richard Mansfield was the direct recipient and Jenny Mansfield the mediate transferee of the funds. The court in *Whitehead and Kales*

stated that a finding of non-contractual indemnity is predicated upon the principle of unjust enrichment. *Id.* at 469. Clearly Richard and Jenny Mansfield would be unjustly enriched if SMB were to pay $46,939.36 and have no recourse against them, since they are the ones who received those funds. Therefore, I find in favor of SMB and against Richard and Jenny Mansfield as to Count I of SMB's cross-claim. To the extent SMB pays any or all of the judgment against it up to $46,939.36, SMB shall have a judgment against Richard and Jenny Mansfield for such amount. SMB requests costs and attorney's fees as part of its indemnification claims. Such requests are without basis and are therefore denied.

 Contribution is an equitable doctrine which provides that a tortfeasor against whom a judgment is rendered is entitled to recover a proportional share of the judgment from other tortfeasors whose negligence contributed to the injury and who are liable to the plaintiff. *Dawson v. Contractors Transport Corp.*, 467 F.2d 727, 729 (D.C.Cir.1972). *See also Campbell Sixty–Six Express, Inc. v. Empire Bank (In re Campbell Sixty–Six Express, Inc.)*, 94 B.R. 1014, 1017 (Bankr. W.D.Mo.1988). This is an appropriate alternative remedy under the facts of this case. I, therefore, find in favor of SMB as to Count II of its cross-claim against Richard and Jenny Mansfield.

A prayer for relief is sought in Count III of SMB's cross-claim for Mansfield's alleged breach of transfer warranties pursuant to the Revised Statutes of Missouri 400.3–417 (1986).[29] Having granted relief to SMB for indemnification and contribution, I will not reach the issue of whether Mansfield breached transfer warranties pursuant to Missouri statutes and the UCC.

 In Count IV of SMB's cross-claim the bank asks this Court to impose a constructive trust against the residence located at 1505 Grand Avenue to the extent funds from the Mansfield's accounts can be traced

---

**29.** Both SMB and Mercantile make reference to section 400.3–416 of Missouri's Revised Statutes in their cross-claims. However, the version of the UCC in effect in Missouri dealing with the breach of transfer warranties at the time of the conversion was section 400.3–417(2)(d). Mo. Rev.Stat. § 400.3–417(2)(d) (1986). A revised version of Article 3 of the UCC was adopted by the Missouri legislature in 1992. Mo.Stat.Ann. § 400.3–416 (1994).

into the home. In order to obtain a constructive trust over property, the plaintiff must first show lack of an adequate remedy at law. *Supra,* Section V. Then the plaintiff must (1) show wrongdoing in the acquisition of the property, and (2) be able to trace the wrongfully held property. *Chiu v. Wong, (In re Wong),* 16 F.3d 306, 310 (8th Cir.1994). *See also, United States Department of Energy v. Seneca Oil Company (In re Seneca Oil Co.),* 906 F.2d 1445, 1450 (10th Cir.1990); *In re The Landing,* 160 B.R. 820, 823 (Bankr. E.D.Mo.1993); *Neal v. Sparks,* 773 S.W.2d 481, 486 (Mo.Ct.App.1989). SMB offered no evidence which traces the converted funds from the Mansfields' accounts numbered 5082 or 5093 directly into the home located at 1505 Grand Avenue. It is undisputed that funds from sources other than debtor were deposited into both said accounts between September, 1991, and March, 1992. *See* Pl. Exh. ## 31–36A and 50–56. Since SMB is unable to trace the wrongfully held property, it has no claim for a constructive trust against said home. Therefore, as to Count IV of SMB's cross-claim, I find in favor of Richard and Jenny Mansfield.

## CONCLUSION

The above judgment can be summarized as follows:

A. As to the trustee's Second Amended Complaint,

(1) I find in favor of Jenny Mansfield as to Count I;

(2) The total judgment against Richard Mansfield is $87,078.99[30] such judgment to be joint and several with SMB to the extent of the judgment against SMB;

(3) I find Richard Mansfield converted funds of debtor, thus, I find in favor of the trustee and against Richard Mansfield as to Count I in the sum of $77,328.47;

(4) I find that the pension plan payment to Mansfield within one year of the involuntary petition was not in the ordinary course of business and is an avoidable transfer, thus, I find in favor of the trustee and against Richard Mansfield as to Count VI in the sum of $9,750.52;

(5) I find SMB violated the UFA, thus, I find in favor of the trustee and against SMB as to Count II in the sum of $46,939.36, such liability to be joint and several with that of Richard Mansfield;

(6) I find Mercantile was negligent but not in violation of the UFA, thus, I find in favor of Mercantile as to Count III;

(7) I find in favor of the Mansfields as to Count IV;

(8) I find Mansfield was not a creditor of the debtor within ninety days of the involuntary petition, and any payment to Mansfield within that period is an avoidable transfer, thus, I find in favor of the trustee and against Mansfield as to Count V, as partial alternative relief to Count I, in the sum of $4,691.33;

(9) I find the trustee did not sufficiently trace the funds at issue in Count VII, thus, I find in favor of Richard Mansfield as to Count VII;

(10) I find SMB was not an initial, immediate, or mediate transferee, thus, I find in favor of SMB as to Count VIII;

(11) I find Mercantile was not an initial, immediate, or mediate transferee, thus, I find in favor of Mercantile as to Count IX;

(12) I find Mansfield made unauthorized post-petition transfers which did not give value to debtor and were not for the purpose of continuing the business of debtor, thus, I find in favor of the trustee and against Richard Mansfield as to Count X, as partial alter-

---

**30.** The judgment against Mansfield can be summarized as follows:

| | | |
|---|---|---:|
| 1. | Broadview funds traced into either account no. 5082 or 5093 at SMB or cash distributed to Mansfield from debtor's funds: | $46,939.36 |
| 2. | Cashier's check deposited into Mansfield's construction account at Mercantile: | 19,303.37 |
| 3. | Windows installed in the Grand Avenue House | 11,085.74 |
| 4. | Preferential pension plan payment: | 9,750.52 |
| | Total | $87,078.99 |

native relief to Count I, in the sum of $61,551.40; and

(13) I find Jenny Mansfield was a mediate transferee of certain of debtor's funds, thus, I find in favor of the trustee and against Jenny Mansfield on Count V in the amount of $3,291.33 and Count X in the amount of $61,069.43, for a total of $64,360.76.

B. As to Mercantile Bank of Joplin's cross-claim against Richard and Jenny Mansfield,

I find in favor of Mercantile in the amount of $16,150.93, such sum to be an additional debt of the Mansfields to Mercantile as provided by Paragraph 7 of the Deed of Trust executed by the Mansfields on or about April 6, 1992.

C. As to Southwest Missouri Bank of Carthage's cross-claim against Richard and Jenny Mansfield, I find:

(1) Against Richard and Jenny Mansfield and in favor of SMB to the extent SMB pays the judgment against SMB; and

(2) Against SMB on its request for a constructive trust.

An Amended Order in accordance with this Amended Memorandum Opinion will be entered this date.